**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**July 23, 2007**

**Charles R. Fulbruge III**
**Clerk**

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

No. 06-70025

BOBBY WAYNE WOODS,

Petitioner-Appellant,

VERSUS

NATHANIEL QUARTERMAN, Director, Texas Department of Criminal
Justice, Correctional Institutions Division,

Respondent-Appellee.

Appeal from the United States District Court
For the Western District of Texas, Austin Division

(1:05-CV-00354)

Before BARKSDALE, DeMOSS, and DENNIS, Circuit Judges.

DeMOSS, Circuit Judge:

In this successive habeas corpus appeal we must decide whether
Petitioner Bobby Wayne Woods is ineligible for execution because he
is mentally retarded. *See Atkins v. Virginia*, 536 U.S. 304 (2002).
For the reasons set forth below, we agree with the district court
that Woods has failed to show he is entitled to relief under the
deferential standards set forth in the Anti-Terrorism and Effective
Death Penalty Act (AEDPA), 28 U.S.C. § 2254.

I.

In 1998, a Texas state jury convicted Woods and sentenced him
to death for the murder of eleven-year-old Sarah Patterson during

the course of a kidnaping. The facts of Woods' crime have been set

forth previously by this Court:[1]

> In the early morning hours of April 30, 1997, Woods went
> to the house of his former girlfriend, Schwana Patterson,
> in Granbury, Texas. Though they had previously lived
> together, the two had split up. Woods later admitted to
> having used drugs before going to the house, including
> "crank" and PCP. Schwana was not at home when Woods
> arrived, but he found an open window into the bedroom
> where Schwana's two children, Sarah, 11, and Cody, nine,
> were sleeping. He grabbed Sarah by the foot; Cody awoke
> to Sarah's screams as Woods beat her chest.
>
> He forced the two children to leave through the window in
> their nightclothes. Later investigation found Woods's
> semen on Sarah's bedcover, indicating that he had had
> sexual contact with her. This was borne out in other
> evidence, including statements by Woods himself, Sarah's
> friends, notes she had left in her diary indicating that
> she hated Woods and wanted him gone, and that she had
> contracted the sexually-transmitted disease Human
> Papilloma Virus ("HPV"). Woods was also infected with
> HPV. When Sarah's body was later found, forensic evidence
> including larvae development in her traumatized genitals
> also indicated that she had been sexually molested.
>
> Woods took the children in his car to a cemetery.
> Enroute, Cody, in the back seat, noticed a black-handled
> knife in the back of the car. At the cemetery, Woods took
> Cody out of the car and asked him if his mother was
> seeing anyone else. He hit Cody and commenced strangling
> him in front of the car. Cody later testified that he
> thought he was going to die. He awoke later, crawled over
> a fence, and attracted the attention of a horseback rider
> who called the police.
>
> The police later found Woods and told him that they had
> the "whole story" from Cody. They asked him to tell them

---

[1] We recognize that a recitation of the oft-grisly facts involved in a death penalty case can, at times, be "irrelevant and unnecessary." *See Uttecht v. Brown*, 127 S. Ct. 2218, 2239 (2007) (Stevens, J., dissenting). However, when the salient issue is whether the Petitioner is mentally retarded, the circumstances of his crime and his testimony at trial can be instructive in evaluating the merits of his *Atkins* claim.

where to find Sarah, hoping that she was still alive. Woods told them, "You will not find her alive. I cut her throat." He then led the police to Sarah's body and gave them two written statements. In the statements, he admitted to having had sexual contact with Sarah before leaving the house, that he had taken drugs, and that after Cody fell unconscious in the cemetery, Sarah had started screaming. He left with her in the car toward a bridge on highway 144. She continued to yell that she would tell the police that he had hit Cody. He attempted to quiet her by holding a knife to her throat. According to his statement, Sarah jerked and the knife cut her throat.

Her body was clothed in an inside-out shirt, a sports bra, and a pair of shorts, without panties. Her throat had been deeply cut, severing her larynx and several major arteries and veins, causing massive external bleeding that was the cause of her death.

In addition to finding Woods's semen on Sarah's blanket, investigators found a large butcher knife, stained with Sarah's blood, inside a trash bag that Woods had borrowed from a neighbor the morning after he abducted Sarah and Cody. The bag also contained a pawn ticket bearing Woods's signature and address for items he admitted stealing from the Patterson home. Sarah's blood was on Woods's jersey, which was in the back of his car; her panties were on the car's floorboard. There was evidence that Woods had scratches on his face and arms on the day after the murder that were not there the day before.

Woods was arrested and charged with, *inter alia*, capital murder and was so indicted on June 4, 1997, in Hood County, Texas. The indictment charged him with the murder of Sarah Patterson in the course of committing or attempting to commit the kidnaping of Sarah and Cody Patterson, or in the alternative, the murder of Sarah in the course of committing or attempting to commit the aggravated sexual assault of Sarah. He was also indicted for the attempted capital murder of Cody, arising out of the same criminal transaction.

On Woods's motion, venue was changed to Llano County, where he pleaded not guilty. At trial, Woods testified on his own behalf and admitted to the general contours of that morning's events, including the abductions, but not to the murder. Instead, he offered a version which tended

3

> to implicate his cousin. He was found guilty by the jury on May 21, 1998. Following a punishment hearing, the jury returned affirmative answers on May 28 on the issues relating to Woods's future dangerousness and intent to commit murder, and a negative answer on the existence of mitigating circumstances to justify a life sentence. The Llano County trial court sentenced Woods to death.

*Woods v. Cockrell*, 307 F.3d 353, 354-55 (5th Cir. 2002).

Woods appealed his conviction and sentence to the Texas Court of Criminal Appeals (TCCA), and the TCCA affirmed. Concurrent with his direct appeal to the TCCA, Woods also filed a state application for habeas corpus relief, which the state habeas court denied.

Woods then filed a petition for a writ of habeas corpus with the U.S. District Court, which it denied. Woods sought a certificate of appealability (COA) from this Court, and we denied his request in a published order. *Woods v. Cockrell*, 307 F.3d 353 (5th Cir. 2002). On April 8, 2003 Woods filed a successor petition for habeas corpus relief in Texas state court raising two issues for review, including his *Atkins* claim. The TCCA remanded the *Atkins* claim to the state trial court and dismissed the second claim as an abuse of the writ. On remand, the state trial court conducted a full evidentiary hearing before entering findings of fact and conclusions of law recommending relief be denied. The TCCA adopted those findings and conclusions and denied relief.

Thereafter, Woods received permission from this Court to file a successive federal habeas petition--although this Court only authorized the petition on the issue "whether Woods is mentally

4

retarded and therefore ineligible for the death penalty according to *Atkins*." *In re Woods*, 155 F. App'x 132, 136 (5th Cir. 2005). Woods filed the successive habeas petition with the district court, and the district court (1) refused, for lack of jurisdiction, to consider all claims not associated with Woods' *Atkins* claim, and (2) denied relief on Woods's *Atkins* claim.

In reaching its conclusion, the district court first considered whether Woods made a prima facie showing of an *Atkins* claim. *See* 28 U.S.C. § 2244(b)(3)(C) (requiring a petitioner to make a prima facie showing that he has met the requirements for filing a successive habeas petition). Finding that Woods had presented more than "minimally sufficient evidence" of mental retardation, the district court agreed with this Court that Woods' petition was proper and warranted fuller examination. The district court then turned to the merits of Woods' *Atkins* claim and denied the petition because Woods failed to meet his "burden of proving, by clear and convincing evidence, that the state court's finding is incorrect." However, after denying relief, the district court granted Woods a COA on his claim, concluding "the state court record contained evidence on which some jurists would be willing to conclude Woods is in fact mentally retarded." *See Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (discussing the requirements for a COA to issue).

II.

5

In a habeas corpus appeal we review the federal district court's findings of fact for clear error and its conclusions of law de novo. *Panetti v. Dretke*, 448 F.3d 815, 817 (5th Cir. 2006). Further, we apply "the same standard of review to the state court's decision as the district court." *Coble v. Dretke*, 444 F.3d 345, 349 (5th Cir. 2006). Woods filed his federal habeas petition after the effective date of AEDPA, and consequently we apply the standards set forth therein.

AEDPA provides that federal courts may only grant habeas relief to a state prisoner if the state court's adjudication on the merits either: 1) "resulted in a decision contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States" or 2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2).

A state court's decision is "contrary to" clearly established federal law under § 2254(d)(1) if "the state court applies a rule that contradicts the governing law announced in Supreme Court cases, or . . . the state court decides a case differently than the Supreme Court did on a set of materially indistinguishable facts." *Nelson v. Quarterman*, 472 F.3d 287, 292 (5th Cir. 2006) (en banc) (internal quotation marks omitted). A state court decision constitutes an "unreasonable application" of clearly established

6

federal law under the same section if the court "identifies the correct governing legal principle from Supreme Court precedent, but applies that principle to the case in an objectively unreasonable manner." *Id.*

Under § 2254(d)(2), we also may grant a habeas corpus petition if the state court's decision was "based on an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d)(2). However, the state court's factual determinations are presumed to be correct, and Woods can only rebut that presumption by clear and convincing evidence. *Id.* § 2254(e)(1).

## III.

Woods argues he is ineligible for the death penalty because he is mentally retarded. In *Atkins v. Virginia,* the Supreme Court held that the Eighth Amendment protects against the execution of mentally retarded individuals. 536 U.S. 304, 319-20 (2002) (reasoning, in part, that mentally retarded offenders are less culpable). The Supreme Court acknowledged that disagreement will often arise "in determining which offenders are in fact retarded" and it left to the states the task of defining mental retardation and "developing appropriate ways to enforce th[is] constitutional restriction." *Id.* at 317 (internal quotation marks omitted).

In response, TCCA held that defendants and petitioners must establish their mental retardation, as defined by either the

7

American Association of Mental Retardation (AAMR)[2] or the Texas Health and Safety Code, by a preponderance of the evidence. *Ex Parte Briseno*, 135 S.W.3d 1, 7-8, 12 (Tex. Crim. App. 2004).[3] The AAMR definition referenced in *Atkins* and *Briseno* has three requirements:

> 1) subaverage general intellectual functioning, generally defined as an IQ below 70;
>
> 2) accompanied by related limitations in adaptive functioning defined as significant limitations in an individual's effectiveness in meeting the standards of maturation, learning, personal independence, and/or social responsibility that are expected for his or her age level and cultural group, as determined by clinical assessment and, usually, standardized scales;[4] and
>
> 3) onset prior to the age of 18.

*Moreno v. Dretke*, 450 F.3d 158, 163 (5th Cir. 2006) (internal quotation marks omitted) (referring to the definition in the ninth edition of the AAMR's *Mental Retardation: Definition, Classification, and Systems of Support*).

---

[2]The Supreme Court cited this definition in *Atkins*. 536 U.S. at 309 n.3.

[3]To the extent that Woods argues this allocation of the burden of proof is inappropriate and that a jury should determine his mental retardation, we have previously rejected that argument. *See In re Johnson*, 334 F.3d 403, 405 (5th Cir. 2003).

[4]The AAMR finds this prong satisfied when "limitations in two or more of the following applicable adaptive skill areas [are present]: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work." *Atkins*, 536 U.S. at 309 n.3.

8

Alternatively, the Texas Health and Safety Code succinctly defines mental retardation as "significantly subaverage general intellectual functioning that is concurrent with deficits in adaptive behavior and originates during the developmental period." TEX. HEALTH & SAFETY CODE § 591.003(13).

The state habeas court held an evidentiary hearing on this issue and we will summarize the evidence presented by both parties. Woods relied primarily on the testimony and written report of Dr. Richard C. Schmitt, who interviewed Woods and Woods' grandmother and reviewed Woods' records before concluding that Woods was mildly mentally retarded.

Regarding Woods' general intellectual functioning (the first AAMR prong), Schmitt conducted a full scale Wechsler Adult Intelligence Scale-III IQ test (WISC) and reported that Woods scored a sixty-eight. Regarding Woods' limitations in adaptive functioning (the second AAMR prong), Schmitt administered the Scales of Independent Behavior Test-Revised, using an interview with Woods' grandmother to gauge the limitations in Woods' adaptive functioning. Based on this test, Schmitt concluded that Woods was functioning at or near his age level in every adaptive behavior category and scale except for "Money and Value." Despite these test results, Schmitt testified that Woods suffered from significant limitations in two of the nine adaptive functioning categories: functional academics and work. *See supra* note 4 (listing the nine

9

adaptive skill areas). As to the third prong--onset before age eighteen--Schmitt concluded that Woods' significantly subaverage intellectual functioning has been ongoing since he first entered formal education.

The State also presented evidence on each of the three required prongs. Regarding Woods' general intellectual functioning, the State introduced Woods' childhood WISC IQ scores, attained while he was in the first and fourth grades, of seventy-eight and eighty. Also, the State introduced evidence that Woods received an eighty-six on the California Short Form examination in 1972, and an eighty-three on a short-form IQ test administered when Woods entered the Texas prison system in 1998.

As to Woods' limitations in adaptive functioning, the State introduced affidavits from Woods' former employers at the Round the Clock Grill, where Woods worked as a short-order cook. The affidavits indicate that Woods was a "good" cook who required little training. The State also relied on Dr. John M. Pita's report, written after Pita examined Woods to determine his competency to stand trial for the murder. Pita concluded that Woods' adaptive behavior was within the normal range.[5]

On the issue of whether Woods' alleged mental retardation had an onset before age eighteen, the State presented testimony from several of Woods' former teachers who stated they did not consider

---

[5]Pita also ultimately opined that Woods "is not mentally retarded."

Woods to be mentally retarded when he was in their respective classes.

Based on this evidence, the state habeas court concluded that Woods failed to prove each required element by a preponderance of the evidence. Regarding Woods' general intellectual functioning, the court noted, in part, the existence of four IQ test scores placing Woods above the seventy-point cutoff. It also found compelling the fact that Dr. Schmitt, the defense's expert, was the only person to test Woods' IQ below seventy and the only expert who has tested Woods and concluded that he is mentally retarded. The court further noted that Woods' lowest IQ score was attained when he had an incentive to perform poorly, but Woods' IQ scores were higher when he had no such incentive.

Regarding Woods' limitations in adaptive functioning, the court found persuasive Dr. Pita's conclusion that Woods' adaptive behaviors were within the normal range and Dr. Schmitt's conclusion that Woods was functioning at or near his age level in every category except one. It was also influenced by the affidavits from his former employers.

Lastly, regarding the third prong, the court found persuasive the fact that "no record exists indicating that Woods was ever diagnosed with mental retardation during his developmental years."

The TCCA adopted the state habeas court's findings of fact and conclusions of law and held that Woods "has not shown by a preponderance of the evidence that he is mentally retarded." Our

11

task, then, is to determine whether the state court's determination that Woods failed to satisfy the *Atkins* requirements is either (1) contrary to or involves an unreasonable application of *Atkins* or (2) based on an unreasonable determination of the facts in light of the evidence presented. *See* 28 U.S.C. § 2254(d).

We agree that Woods has failed to make the required showing. First, the state habeas court's conclusion that Woods failed to demonstrate that he suffered from subaverage general intellectual functioning was not unreasonable. Woods presented expert testimony to support his contention, but the state habeas court chose to give more weight to Woods' childhood IQ test scores than the score attained in Dr. Schmitt's testing. We find this reasonable in light of the testimony that the childhood scores were more reliable, in part because Woods' recent scores could be the result of a motivation to score poorly.

Second, Woods submitted very little evidence that he suffered from significant limitations in adaptive functioning. Although Dr. Schmitt testified that Woods had significant deficits in two adaptive skill areas, Schmitt conceded in his report that Woods was within the normal range in every category on the Scales of Independent Behavior Test, except Money and Value. Dr. Schmitt further admitted that Woods functioned at or above his age level with respect to the Broad Independence test, which he stated was similar to an IQ score for adaptive functioning. Lastly, any

12

evidence favoring Woods on this prong was significantly diminished by the evidence of Woods' job performance at the Round the Clock Grill.

Third, in light of its findings on the first two prongs, it is axiomatic that the state court's conclusion that Woods failed to prove onset of mental retardation before age eighteen was reasonable.

In sum, the state court's conclusion--that Woods failed to prove by a preponderance of the evidence that he is mentally retarded--is not contrary to *Atkins* because the state court did not apply a rule that contradicted *Atkins*, and Woods can cite no materially indistinguishable case decided differently by the Supreme Court. *See Nelson*, 472 F.3d at 292. Woods argues that the state habeas court merely found that Woods was "not mentally retarded enough"--contrary to the rule in *Atkins*. This statement is disingenuous at best. The state habeas court analyzed the evidence under the proper AAMR framework and concluded that Woods was not mentally retarded.[6]

Further, given the substantial evidence presented indicating that Woods is not mentally retarded, we cannot say that the state court applied *Atkins* in an objectively unreasonable manner. *See id.*

---

[6]Woods also argues that *Ex parte Briseno*, relied on by the state habeas court, is contrary to *Atkins* in the way it allows courts to evaluate limitations in adaptive behavior. *See* 135 S.W.3d 1 (Tex. Crim. App. 2004). We find nothing in *Briseno* that is inconsistent with *Atkins* in this regard.

Lastly, to the extent Woods argues that the state court's decision was "based on an unreasonable determination of the facts in light of the evidence presented," 28 U.S.C. 2254(d)(2), he has failed to rebut, by clear and convincing evidence, the presumption that the state court's factual findings are correct. *See Clark v. Quarterman*, 457 F.3d 441, 444 (5th Cir. 2006) (noting a state court's determination under § 2254(d)(2) is a question of fact); *see also* 28 U.S.C. 2254(e)(1).

## IV.

For the foregoing reasons we AFFIRM the judgment of the district court denying federal habeas corpus relief.

AFFIRMED.