# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

October 29, 2010

Lyle W. Cayce
Clerk

No. 10-70003

VIRGILIO MALDONADO,

Petitioner - Appellant

v.

RICK THALER, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL
JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,

Respondent - Appellee

Appeal from the United States District Court
for the Southern District of Texas

Before KING, STEWART, and HAYNES, Circuit Judges.

KING, Circuit Judge:

The petitioner–appellee, Virgilio Maldonado, was sentenced to death in 1997 in Texas state court for a murder committed during the course of a robbery in 1995. After exhausting state-court avenues for postconviction relief, he sought habeas relief under 28 U.S.C. § 2254 in federal district court. The district court denied the petition for habeas relief and denied a certificate of appealability (COA). We granted a COA as to Maldonado's claim that he is mentally retarded and therefore ineligible for the death penalty under *Atkins v. Virginia*, 536 U.S. 304 (2002), and ordered supplemental briefing on that issue.

No. 10-70003

We denied a COA as to all other issues.  We now address the *Atkins* claim and affirm the district court's denial of habeas relief.

## I.    BACKGROUND

### A.    Factual and Procedural Background

Maldonado, a Mexican national, was tried and convicted of capital murder in Texas state court in 1997 for the November 1995 robbery and murder of Cruz Saucedo.  Saucedo was found shot twice in the head with a .45-caliber semi-automatic weapon, his hands bound with the electric cord of a Black & Decker iron.  The murder went unsolved until several months later, when Maldonado confessed to the murder after being arrested for an unrelated bank robbery.  According to Maldonado's confession, he entered Saucedo's house with another man while a third accomplice waited in a car.  Maldonado's companion wanted to borrow an AK-47 from Saucedo.  When Saucedo refused the loan, they bound him and demanded to know where the weapon and some marijuana were kept.  Maldonado's companion retrieved these items and told Maldonado to kill Saucedo.  Maldonado did so, using a pillow to muffle the sound of the gunshots.  The State of Texas charged and tried Maldonado for murder in the course of a robbery.  The jury convicted Maldonado of capital murder and determined that he should receive a death sentence.

Maldonado filed an automatic direct appeal of his conviction with the Texas Court of Criminal Appeals (TCCA), which affirmed his conviction and sentence after considering his points of error on the merits.  *See Maldonado v. State*, 998 S.W.2d 239 (Tex. Crim. App. 1999).  While that appeal was pending, he filed his first application for a writ of habeas corpus, which the TCCA denied.  *Ex parte Maldonado*, No. 51,612-01 (Tex. Crim. App. 2002).  After the Supreme Court concluded, in *Atkins v. Virginia*, 536 U.S. 304, that the Eighth Amendment precludes the execution of mentally retarded persons, Maldonado filed a subsequent state habeas application in the TCCA in which he claimed

2

that he was mentally retarded and therefore ineligible for the death penalty. *Ex parte Maldonado*, No. 51,612-02 (Tex. Crim. App.). The TCCA remanded to the state habeas trial court to take evidence and enter findings of fact and conclusions of law on the *Atkins* claim. *Ex parte Maldonado*, No. 51,612-02 (Tex. Crim. App. 2003).

After a live evidentiary hearing, the state habeas trial court entered findings of fact and conclusions of law recommending that relief be denied on Maldonado's *Atkins* claim. The TCCA adopted the state habeas trial court's findings of fact and conclusions of law and denied relief. *See Ex parte Maldonado*, Nos. 51,612-02, 51,612-03, 2007 WL 2660292, at *1 (Tex. Crim. App. Sept. 12, 2007). Maldonado challenged this ruling and others in a federal habeas petition under 28 U.S.C. § 2254. The district court denied all of Maldonado's claims and sua sponte denied a COA. *Maldonado v. Thaler*, 662 F. Supp. 2d 684 (S.D. Tex. 2009). We granted a COA only as to the *Atkins* issue—the subject of the instant appeal. *Maldonado v. Thaler*, No. 10-70003, 2010 WL 3155236 (5th Cir. Aug. 10, 2010).

## B.   The *Atkins* Decision and *Briseno* Framework

In *Atkins v. Virginia*, 536 U.S. 304, the Supreme Court held that the Eighth Amendment forbids the execution of mentally retarded persons. The *Atkins* Court, however, "le[ft] to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon their execution of sentences." *Id.* at 317 (alterations and internal quotation marks omitted). The relevant standard in Texas was set out by the TCCA in *Ex parte Briseno*, 135 S.W.3d 1, 7 (Tex. Crim. App. 2004). The *Briseno* court held that mental retardation claims should be adjudicated under the framework established by the American Association on Mental Retardation (AAMR), in conjunction with the standard supplied by the Texas Persons with Mental Retardation Act, TEX. HEALTH & SAFETY CODE § 591.003(13) ("'Mental retardation' means significantly

No. 10-70003

subaverage general intellectual functioning that is concurrent with deficits in adaptive behavior and originates during the developmental period."). As quoted in *Atkins*, the AAMR supplies the following definition of mental retardation:

> Mental retardation refers to substantial limitations in present functioning. It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. Mental retardation manifests before age 18.

*Atkins*, 536 U.S. at 309 n.3 (quoting AAMR, MENTAL RETARDATION: DEFINITION, CLASSIFICATION, AND SYSTEMS OF SUPPORTS 5 (9th ed. 1992)). Briefly stated, *Briseno* requires three elements for a finding of mental retardation: (1) significantly subaverage intellectual functioning (generally, a full-scale IQ score of 70 or below); (2) deficits in adaptive functioning; and (3) onset before age 18. *See Briseno*, 135 S.W.3d at 7.

In *Briseno*, the TCCA made clear that although the determination of whether an applicant meets this three-prong standard requires careful consideration of the relevant psychological standards—and expert testimony obviously assists with this assessment—the ultimate determination as to mental retardation must be made by the court, based on what the Constitution requires. The TCCA explained:

> Although experts may offer insightful opinions on the question of whether a particular person meets the psychological diagnostic criteria for mental retardation, the ultimate issue of whether this person is, in fact, mentally retarded for purposes of the Eighth Amendment ban on excessive punishment is one for the finder of fact, based upon all of the evidence and determinations of credibility.

*Id.* at 9.

**C.     Maldonado's *Atkins* Claim**

Maldonado's *Atkins* claim received extensive consideration in the state habeas court.  Maldonado submitted to psychological testing by the State's expert, Dr. George Denkowski, a clinical psychologist, and by two of his own experts, Dr. Ricardo Weinstein, a forensic neuropsychologist, and Dr. Antonio Puente, a professor of psychiatry and neuropsychologist.  Each of these experts submitted an affidavit to the state habeas trial court.  To supplement these affidavits with live testimony, and to provide an opportunity for cross-examination, the state habeas trial court conducted an extensive, seven-day evidentiary hearing on the *Atkins* issue on September 11, 13, 14, and 15 and November 16, 17, and 27, 2006.  Dr. Denkowski testified for the State and Dr. Puente testified on behalf of Maldonado.  Dr. Weinstein did not testify. Maldonado called an additional expert, Dr. Jack Fletcher, who had not examined Maldonado but who provided additional testimony intended to rebut Dr. Denkowski's testimony.  Both sides also called lay witnesses to testify as to Maldonado's adaptive behavior.

After considering the expert affidavits and testimony, the lay testimony, and numerous exhibits, the state habeas trial court concluded that Maldonado had not met his burden of presenting evidence sufficient to satisfy any of the three prongs of the *Briseno* test.  Accordingly, it entered findings of fact and conclusions of law recommending that Maldonado be found not mentally retarded.  Although these findings credited and cited extensively to Dr. Denkowski's testimony, they were also structured such that the result would not change if the results of the tests administered by Dr. Denkowski were disregarded. The findings and conclusions did, however, rely on Dr. Denkowski's critiques of other experts' evidence, and were not specifically structured to stand if Dr. Denkowski's critiques were discounted.  The TCCA adopted the state habeas trial court's findings and conclusions in their entirety and accordingly

denied Maldonado's subsequent habeas application.  *See Ex parte Maldonado*, Nos. 51,612-02, 51,612-03, 2007 WL 2660292, at \*1 (Tex. Crim. App. Sept. 12, 2007).  Maldonado then filed the instant federal habeas petition.

While Maldonado's federal habeas application was pending, the TCCA issued an opinion, *Ex parte Plata*, No. AP-75820, 2008 WL 151296, at \*1 (Tex. Crim. App. Jan. 16, 2008), in which it refused to credit Dr. Denkowski's testimony in connection with another habeas case.  The state habeas trial court, whose recommendations the TCCA adopted in full, concluded that there were "fatal errors in Denkowski's administration and scoring of Plata's IQ and adaptive deficit tests."  *See id.*; *Ex parte Plata*, No. 693143-B (Tex. 351st Dist. Sept. 28, 2007).  The Texas State Board of Examiners of Psychologists ("State Board") subsequently filed a complaint against Dr. Denkowski with the State Office of Administrative Hearings (SOAH), attaching the state habeas trial court's findings in *Plata* and seeking to sanction him for intentionally misapplying psychiatric testing methods in that case.  *See* SOAH Docket No. 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.   The Board's complaint also alleges that Dr. Denkowski "intentionally misused or abused psychological testing . . . in connection with [his] forensic assessments of . . . Maldonado."  It contends, in relevant part, that:

64.   The Respondent failed to properly address language and cultural issues with Maldonado, a native of Mexico.

65.  Respondent administered the self-report portion of the Adaptive Behavior Assessment System (ABAS) to Maldonado using a Spanish-language interpreter from the court system to translate questions due to the subject's limited ability to speak English and Respondent's inability to speak Spanish.

66.  Respondent deviated from established testing protocols in the evaluation and scoring of Maldonado's intellectual functioning.

67.  The adjustments Respondent made to Maldonado's adaptive behavior scores were not scientifically valid.

68.  Respondent used maladaptive behavior to assess adaptive behavior.

No. 10-70003

> 69.   Respondent also used the interpreter as a translator to administer the Weschler Adult Intelligence Scale 3rd Ed. (WAIS-III) to Maldonado and doing so rendered the test scores invalid.

First Amended Complaint, SOAH Docket No. 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 (Feb. 9, 2010).  The complaint has not yet been resolved.  Proceedings before the SOAH are pending; discovery is ongoing; and counsel represented at oral argument that a hearing is not to occur before May 2011.[1]  Maldonado timely notified the federal district court about the *Plata* case and about the State Board's proceedings against Dr. Denkowski.

The district court conducted a careful and detailed review of the record, and in particular considered whether the new revelations about Dr. Denkowski's work in the *Plata* case and the pending State Board complaint against him in the SOAH provided a basis to question or reject the state habeas court's analysis.  The district court noted that many of the errors that Dr. Denkowski apparently committed in the *Plata* case did not appear to have been repeated in his assessment of Maldonado, but allowed that the *Plata* errors might raise issues as to Dr. Denkowski's credibility.  *Maldonado v. Thaler*, 662 F. Supp. 2d at 715 n.31, 729 n.51.  The district court also noted, however, that "[t]he state court's adjudication denied relief independent of Dr. Denkowski's testing,

---

[1] The complaint alleges that Dr. Denkowski violated the following State Board rules in connection with his evaluation of Maldonado:  Rule 465.9(a)–(e), (h)–(j) (requiring that licensees provide "only services for which they have the education, skills, and training to perform competently"; take into account subjects' "age, gender, ethnicity, national origin, disability, language, and socio-economic status"; "maintain current knowledge of scientific and professional information"; employ "new techniques only after first undertaking appropriate study and training"; and withdraw from providing services if lacking the appropriate skills); Rule 465.10 (requiring that "[l]icensees rely on scientifically and professionally derived knowledge when making professional judgments"); Rule 465.16(b)(1), (2) (requiring that licensees use assessment techniques or tests "only if they are familiar with the reliability, validation and related standardization or outcome studies of, and proper applications of, the[se] techniques"); Rule 465.18(a)(2)–(4), (b)(1),(2) (requiring that licensees base all assessments and recommendations upon "information and techniques sufficient to provide appropriate substantiation for each finding" and decline to render opinion in areas "about which the licensee does not have the appropriate knowledge and competency").

possibly in recognition [of] the concerns raised by Maldonado's experts." *Id.* at 724–25, 729. The district court concluded, in agreement with the state habeas court, that even if the results of Dr. Denkowski's testing of Maldonado were disregarded completely, Maldonado could not meet his burden of establishing mental retardation. *Id.* at 724, 729. Like the state habeas court, however, the district court did rely on criticisms supplied by Dr. Denkowski in reaching this conclusion. The district court held that "the state habeas court was [not] unreasonable in finding that Maldonado was not mentally retarded as understood by *Atkins*." *Id.* at 735.

This appeal followed. Maldonado contends that the district court erred in concluding that Dr. Denkowski's alleged administrative and scoring errors, particularly in light of the *Plata* case and the State Board proceedings against Dr. Denkowski, did not provide a basis for disregarding Dr. Denkowski's testimony in its entirety. Maldonado argues in particular that the court's assessment of the other experts' testimony relied too heavily on criticisms by Dr. Denkowski.

## II.   STANDARD OF REVIEW

This habeas proceeding is subject to the Antiterrorism and Effective Death Penalty Act (AEDPA), 28 U.S.C. § 2254, because Maldonado filed his federal petition on May 9, 2007, well after AEDPA's effective date. *See Lindh v. Murphy*, 521 U.S. 320, 335–36 (1997). "Under AEDPA, if a state court has adjudicated a habeas petitioner's claims on the merits, he may receive relief in the federal courts only where the state court decision 'resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,' or 'resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Rivera v. Quarterman*, 505 F.3d 349, 356 (5th Cir. 2007) (quoting 28 U.S.C. § 2254(d)).

No. 10-70003

"A state court's decision is deemed contrary to clearly established federal law if it reaches a legal conclusion in direct conflict with a prior decision of the Supreme Court or if it reaches a different conclusion than the Supreme Court based on materially indistinguishable facts." *Gray v. Epps*, 616 F.3d 436, 439 (5th Cir. 2010) (citing *Williams v. Taylor*, 529 U.S. 362, 404–08, 120 S. Ct. 1495 (2000)).  To merit habeas relief, a state habeas court's application of federal law must be not only incorrect but "objectively unreasonable." *Renico v. Lett*, 130 S. Ct. 1855, 1865 (2010).  A state court's factual findings are "presumed to be correct," although a habeas petitioner may rebut this presumption by "clear and convincing evidence."  28 U.S.C. § 2254(e)(1).  We review the district court's conclusions of law de novo, applying the same standard of review that the district court applied to the state court decision. *Jones v. Cain*, 600 F.3d 527, 535 (5th Cir. 2010).

The question of whether a defendant suffers from mental retardation involves issues of fact, and thus is subject to a presumption of correctness that must be rebutted by clear and convincing evidence under § 2254(e)(1). *Clark v. Quarterman*, 457 F.3d 441, 444, 447 (5th Cir. 2006).  On appeal, as in the district court, Maldonado bears the burden of establishing by a preponderance of the evidence that he is mentally retarded. *Briseno*, 135 S.W.3d at 12; *Woods v. Quarterman*, 493 F.3d 580, 585 & n.3 (5th Cir. 2007).

### III.   DISCUSSION

Maldonado's chief contention on appeal is that Dr. Denkowski's testing and scoring methodologies were egregiously and fatally flawed.  Although Maldonado does not dispute that the state habeas court structured its opinion so as not to rely on Dr. Denkowski's test results, he argues that Dr. Denkowski's methodology in administering and scoring those tests was so flawed that all of Dr. Denkowski's testimony—including his critiques of other evidence in the record—should be disregarded in its entirety as non-credible.  As discussed

below, we do not agree that the specific challenges that Maldonado has raised regarding Denkowski's methodology in calculating the raw WAIS-III score provide a basis for concluding that the state habeas court was unreasonable in considering that score. More troubling, however, are the scoring enhancements that Dr. Denkowski applied to Maldonado's WAIS-III and ABAS results—enhancements that are presently a subject of the State Board complaint against Dr. Denkowski, and that are similar to those that the TCCA declined to credit in *Plata*. As discussed below, however, assuming without deciding that this evidence rebuts the presumption of correctness that attaches to the state habeas court's decision to credit Dr. Denkowski's testimony, Maldonado is not entitled to habeas relief because even disregarding that testimony, he cannot meet his burden of showing that the state court's finding that he is not mentally retarded was either an unreasonable application of *Atkins* or an unreasonable determination of the facts in light of the evidence presented in state court.

## A.    Dr. Denkowski's Results

Dr. Denkowski examined Maldonado on May 23 and 24, 2005. Along with a number of other tests, he administered the Wechsler Adult Intelligence Scale, Third Edition (WAIS-III) to measure Maldonado's intellectual functioning and the Adaptive Behavior Assessment Scale (ABAS) to measure Maldonado's adaptive functioning. The parties agreed that, when administered under proper conditions, the WAIS-III is the "gold standard" for evaluating intellectual functioning. Both tests were administered with the assistance of an interpreter who, though State licensed in Spanish–English translation, did not have a background in psychology and had never translated a written psychological instrument before Maldonado's examination. Dr. Denkowski concluded, based on that examination and relying in particular on the results of the WAIS-III and ABAS, that Maldonado was not mentally retarded. Maldonado challenges both

No. 10-70003

his raw WAIS-III score and the upward enhancements that Dr. Denkowski applied to both the WAIS-III and ABAS scores.

**1.     The Raw WAIS-III Score**

Dr. Denkowski's administration of the WAIS-III yielded a raw score of 74 on the verbal portion, 74 on the performance portion, and a full-scale IQ of 72—all above the threshold of 70 typically required to establish a showing of significantly subaverage intellectual functioning, although the low end of the confidence band for these scores could potentially qualify. Maldonado contends that Dr. Denkowski's use of an interpreter invalidates these raw scores because "the use of a translator renders data and conclusions generated from an examination [per se] unreliable." This argument is not persuasive. As the district court noted, the WAIS-III manual states that "administering the test with the assistance of a translator" is one "useful" approach employed by experienced examiners "when testing individuals who are not fluent in English." *Maldonado v. Thaler*, 662 F. Supp. 2d at 714 (internal quotation marks omitted; quoting David Wechsler, WAIS-III ADMINISTRATION AND SCORING MANUAL 34 (3d ed. 2003). Furthermore, the evidence at the state evidentiary hearing showed that two of Maldonado's own experts, Drs. Puente and Fletcher, have endorsed the use of translators in psychological testing at least in certain contexts. Maldonado's arguments do not demonstrate unreasonableness in the state habeas court's conclusion that Dr. Denkowski's use of a translator did not render the WAIS-III results per se invalid.

Maldonado urges, however, that the particular *way* in which Dr. Denkowski used the interpreter rendered the test results unreliable, because the interpreter was required to translate the test contemporaneously and informally, without advance preparation, and because the interpreter did not have a background in psychology. At the evidentiary hearing, Maldonado's experts testified that the interpreter's lack of advance preparation and lack of

11

psychological expertise could—and in Maldonado's case, did—result in significant translation errors. But Maldonado's own experts disagreed as to whether these problems could have artificially *increased* his score. Dr. Puente testified, in agreement with Dr. Denkowski, that translation problems would only tend to lower the resulting score. Dr. Fletcher, however, opined that errors could also raise the score. The state habeas court discounted Dr. Fletcher's testimony, concluding that to the extent that the use of a translator might have affected Maldonado's score, "such impact would most likely interfere with [his] optimal performance and suppress [his] IQ scores." The state habeas court concluded that because translation errors would have had, if anything, a suppressive effect, they did not provide a basis for concluding that Dr. Denkowski's administration of the WAIS-III resulted in an artificially high raw score. Particularly because Maldonado's own experts conflicted as to the effect or significance of translation errors, we agree with the district court that Maldonado's arguments do not rebut the presumptive correctness of the state habeas court's conclusion. *Cf. Moore v. Quarterman*, 517 F.3d 781, 784 (5th Cir. 2008) (declining to find the state habeas court even arguably unreasonable in crediting one side of conflicting expert testimony, when that testimony was sufficient to sustain the state habeas court's finding).[2]

Maldonado also argues that this court should not credit Dr. Denkowski's testimony because he failed to take account of the "Flynn Effect," which "posits that, over time the IQ scores of a population rise without corresponding increases in intelligence and thus the test must be re-normalized over time." *In re Mathis*, 483 F.3d 395, 398 n.1 (5th Cir. 2007). As the district and state habeas

---

[2] The complaint filed against Dr. Denkowski in the SOAH accuses him of improperly using an interpreter in administering the WAIS-III test. We take no position as to whether the way in which Dr. Denkowski used the interpreter was in fact improper. We hold only that the state habeas court was not unreasonable in its conclusion that the use of an interpreter did not artificially increase Maldonado's raw WAIS-III full-scale IQ score.

courts recognized, however, neither this court nor the TCCA has recognized the Flynn Effect as scientifically valid. *See id.*; *see also In re Salazar*, 443 F.3d 430, 433 n.1 (5th Cir. 2006); *Neal v. State*, 256 S.W.3d 264, 273 (Tex. Crim. App. 2008) ("We have previously refrained from applying the Flynn effect . . . , noting that it is an 'unexamined scientific concept' that does not provide a reliable basis for concluding that an appellant has significant sub-average general intellectual functioning." (quoting *Ex parte Blue*, 230 S.W.3d 151, 166 (Tex. Crim. App. 2007)).  Maldonado's arguments do not show that the state habeas court unreasonably applied federal law, nor do they rebut the presumption of correctness that attaches to the state habeas court's decision to credit the raw score.

## 2.    The Adjusted WAIS-III and ABAS Scores

Of different and greater concern, however, are the upward adjustments that Dr. Denkowski made to Maldonado's WAIS-III and ABAS scores.  In both cases, Dr. Denkowski opined that "cultural and educational factors," as well as mild anxiety and depression, could have artificially suppressed Maldonado's raw score.  Applying these factors, Dr. Denkowski estimated that Maldonado's "true" WAIS-III score was between 74 and 83.  Although the WAIS-III manual instructs that an artificially low score may result from, among other factors, "[c]ultural or linguistic discrepancy from the test standardization table, distractability, anxiety, deafness, poor motivation or inadequate persistence," Maldonado contends, as his experts urged at the hearing, that Dr. Denkowski's proposed adjustments were fatally flawed because they did not result from any statistical formula or established methodology, and because Dr. Denkowski lacked the cultural knowledge that would allow him to properly and accurately adjust for the effects of Maldonado's impoverished upbringing in rural Mexico.

Dr. Denkowski applied similar factors when scoring the ABAS, relying upon his "clinical judgment" and his purported knowledge of Mexican cultural

norms to revise Maldonado's raw ABAS score significantly upward to 67. The ABAS is based upon a self-reporting examination. As the district court explained:

> The ABAS asks the subject whether he can perform certain tasks or skills. He rates his own abilities from 0 (the skill cannot be performed) to 3 (the skill is almost always performed correctly) on 239 skills [in 10 skill areas]. The examiner then tabulates the answers into a composite score that, if below [70], shows deficits in adaptive behavior.

*Maldonado v. Thaler*, 662 F. Supp. 2d at 728. Dr. Denkowski adjusted Maldonado's scores upward on approximately 30% of the questions and did not adjust any of the scores downward. Maldonado argues that the problems with Dr. Denkowski's methodology in scoring the ABAS were compounded by the facts that Dr. Denkowski administered the test using an interpreter and failed to verify Maldonado's self-reported responses by interviewing Maldonado's teachers, relatives, or associates.

The challenges that Maldonado's experts raised to these scoring enhancements at the state evidentiary hearing are echoed in the State Board's complaint against Dr. Denkowski and in *Plata*, in which the TCCA rejected Dr. Denkowski's testimony in its entirety as non-credible because he employed similar methodology. Maldonado urges that these authorities show that the state habeas court was unreasonable in failing to disregard Dr. Denkowski's testimony in its entirety, and further urges that if Dr. Denkowski's testimony is completely disregarded, he can meet his burden of establishing mental retardation. We need not decide whether these authorities are sufficient to rebut the presumption of correctness that attaches to the state habeas court's decision, however, because assuming without deciding they are, we conclude that Maldonado could not, with the evidence that would remain, meet his burden for obtaining federal habeas relief.

Upon federal habeas review of a state court's adjudication, we ultimately "review only a state court's 'decision,' and not the written opinion explaining that decision.'" *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (en banc); *see also Santellan v. Cockrell*, 271 F.3d 190, 193 (5th Cir. 2001) ("The statute compels federal courts to review for reasonableness the state court's ultimate decision, not every jot of its reasoning."). The state court's determination here was that Maldonado failed to meet the *Briseno* test for showing that he is mentally retarded. Even if we disregard Dr. Denkowski's testimony, we conclude that Maldonado fails to show the state habeas court's decision was an unreasonable application of federal law or an unreasonable determination of the facts in light of the remaining evidence. *See* § 2254(d). An analysis of this remaining evidence, and the reasons for this conclusion, are set out below.

## B.   The Remaining Evidence

### 1.   Intellectual Functioning

Two of Maldonado's experts, Drs. Weinstein and Puente, administered tests of intellectual functioning to him. Dr. Weinstein administered two such tests. The first was the verbal portion of a Spanish version of the WAIS-III, called the Escala Inteligencia Wechsler para Adultos (WAIS-Español). Maldonado scored an 83 on the verbal portion and scored a 90 on the comprehension, similarities, and vocabulary subsections of that verbal portion—all well above the score of 70 that roughly forms the upper bound for a finding of significantly subaverage intellectual functioning. Dr. Weinstein did not disclose in his expert report that he had administered this test—the results were only brought to the state habeas court's attention because Dr. Denkowski discovered the administration while researching Dr. Weinstein's testing protocols. We are troubled, as were the district and state habeas courts, that "Dr. Weinstein never explained why he chose to administer that test, why he did

not perform the entire test, or why he did not report his partial conclusions." *Maldonado v. Thaler*, 662 F. Supp. 2d at 718.

Maldonado's experts at the evidentiary hearing, Drs. Puente and Fletcher, urged that the state habeas court should not credit the WAIS-Español score. Dr. Puente testified that Dr. Weinstein's use of the WAIS-Español was problematic because it was normed for Spanish speakers from Puerto Rico, who may have linguistic differences from Maldonado's native Mexico. Dr. Fletcher urged that the WAIS-Español was likely to yield scores "substantially higher than those you would get on the WAIS[-III]," but did not quantify the amount by which the result might overstate Maldonado's IQ. Drs. Puente and Fletcher, however, made no effort to explain why, given these shortcomings, Maldonado's own expert had decided to administer a portion of the WAIS-Español. We agree with the district court, therefore, that Maldonado fails to show that the state habeas court's reliance on the partial administration of the WAIS-Español was unreasonable. This reliance was one basis upon which the state court determined that Maldonado had not met his burden of demonstrating significantly subaverage intellectual functioning, and Maldonado has not presented evidence sufficient to rebut the presumption of correctness in that conclusion.

Dr. Weinstein also administered the Woodcock-Munoz Bateria-R ("Bateria-R), the Spanish language version of the Woodcock-Johnson Test of Cognitive Abilities, Revised. That administration, which Dr. Weinstein did report, yielded an IQ score of 61. As the state habeas court noted, and Maldonado does not dispute, the AAMR has not cited the Bateria-R as an appropriate test for assessing the intellectual functioning aspect of a mental retardation diagnosis. Because the AAMR has not specifically cited the test as appropriate, and because Dr. Weinstein never attempted to explain the discrepancy between the WAIS-Español result and the Bateria-R result—or why the latter should be

credited over the former—we cannot conclude that the state habeas court's decision to accord little weight to the Bateria-R result was unreasonable. *See Woods*, 493 F.3d at 586–87 (state habeas court was not unreasonable in deciding to accord less weight to certain test results, where testimony supported the conclusion that those results were less reliable).

Dr. Puente also administered two tests, the Beta-III and the Comprehensive Test of Nonverbal Intelligence (CTONI). Dr. Puente testified that both are neuropsychological tests that measure nonverbal ability. As with the Bateria-R, the state habeas court noted and Maldonado does not dispute that the AAMR does not cite these tests as providing a basis for assessing intellectual functioning. Another of Maldonado's experts, Dr. Fletcher, testified on cross-examination that neither of these testing instruments could be used to produce a full-scale IQ score. In a recent decision, the TCCA has indicated that a full-scale IQ score should provide the basis for any assessment of intellectual functioning. *See Ex parte Hearn*, 310 S.W.3d 424, 431 (Tex. Crim. App. 2010) ("[N]europsychological measures [may not] wholly replace full-scale IQ scores in measuring intellectual functioning."); *see also Moore v. Quarterman*, 342 F. App'x 65, 81 n.27 (5th Cir. 2009) (noting the "standard professional view" that the CTONI is not a measure of general intelligence). Dr. Puente's administration of the Beta-III yielded an IQ score of 70—which Dr. Puente agreed did not, by itself, qualify Maldonado for a diagnosis of mental retardation. Dr. Puente's administration of the CTONI yielded an IQ score of 61. Because the AAMR has not cited either test as providing a basis for assessing intellectual functioning; because Maldonado's own expert, Dr. Fletcher, opined that neither of these tests was an appropriate method of calculating a full-scale IQ score; and because Dr. Puente conceded that the Beta-III results would not support a diagnosis of mental retardation, Maldonado has not shown that the state habeas court unreasonably determined that he lacked subaverage

17

intellectual functioning. This is particularly true in light of the TCCA's recent pronouncement in *Hearn*, 310 S.W.3d at 429.

In sum, the state habeas court's decision was not contrary to or an unreasonable application of *Atkins*, and Maldonado did not rebut the presumption of correctness that attaches to the state habeas court's conclusion that Maldonado did not meet his burden of showing significantly subaverage intellectual functioning under the first prong of the *Briseno* mental retardation standard. He therefore cannot show that the state habeas court's factual determination was unreasonable. *See Woods*, 493 F.3d at 587 ("[T]o the extent Woods argues that the state court's decision was 'based on an unreasonable determination of the facts in light of the evidence presented,' 28 U.S.C. 2254(d)(2), he has failed to rebut, by clear and convincing evidence, the presumption that the state court's factual findings are correct."). And because fulfillment of each prong is necessary to a finding of mental retardation, this conclusion ends the inquiry. As discussed below, however, we also find that Maldonado did not present evidence sufficient to rebut the presumed correctness of the state habeas court's decision that Maldonado did not meet the second *Briseno* prong.

### 2.    Adaptive Deficits

Maldonado's experts extensively criticized Dr. Denkowski's methodology in administering and scoring the ABAS. They did not, however, themselves administer to Maldonado the ABAS or any other formal testing instrument for adaptive deficits. Dr. Weinstein's affidavit did not discuss the adaptive behavior prong at all. Dr. Fletcher addressed adaptive behavior only to the extent of criticizing Dr. Denkowski's administration of the ABAS. The only non-rebuttal testimony as to Maldonado's adaptive deficits came from Dr. Puente, who testified, based on affidavits prepared by Maldonado's father and others who knew him, that Maldonado had exhibited some adaptive deficits, particularly in

18

his formative years. Dr. Puente found deficits in functional academics (Maldonado was slow in school); banking (when Maldonado and his wife finally opened a checking account after immigrating to the United States, it was not clear that he knew how to use it); public transportation (before age 18, Maldonado's use of public transportation apparently was limited); leisure (Maldonado did not report any hobbies beyond recreational drug use); and social relationships (before age 18, his romantic relationships with females were unsuccessful and his closest relationship was with his stepfather, with whom he lived only briefly). Dr. Puente explained that he had not conducted any standardized testing for adaptive deficits because there were no standardized tests written in Spanish and he believed translating would be inappropriate. The state habeas court relied primarily on lay testimony provided by witnesses for both parties in concluding that Maldonado had not shown adaptive deficits sufficient to satisfy the second *Briseno* prong.

Although the AAMR contemplates that adaptive deficits, defined as "significant limitations in an individual's effectiveness in meeting the standards of maturation, learning, personal independence, and/or social responsibility that are expected for his or her age level and cultural group," will be "determined by clinical assessment and, usually, standardized scales," *Briseno*, 135 S.W.3d at 7 n.25, *Briseno* does not require that an assessment of adaptive deficits be premised upon the results of standardized tests or expert opinion, *id*. at 8; *see also Hearn*, 310 S.W.3d at 428 ("[S]tandardized tests are not the sole measure of adaptive functioning, [but] they may be helpful to the factfinder, who has the ultimate responsibility for determining mental retardation."). Indeed, the *Briseno* court emphasized that "[a]lthough experts may offer insightful opinions . . . the ultimate issue of whether [a] person is, in fact, mentally retarded for purposes of the Eighth Amendment ban on excessive punishment is one for the finder of fact." 135 S.W.3d at 9. *Briseno* cites the following considerations as

No. 10-70003

being particularly important to determining whether the adaptive deficit prong has been met:

- Did those who knew the person best during the developmental stage—his family, friends, teachers, employers, authorities—think he was mentally retarded at that time, and if so, act in accordance with that determination?

- Has the person formulated plans and carried them through or is his conduct impulsive?

- Does his conduct show leadership or does it show that he is led around by others?

- Is his conduct in response to external stimuli rational and appropriate, regardless of whether it is socially acceptable?

- Does he respond coherently, rationally, and on point to oral or written questions or do his responses wander from subject to subject?

- Can the person hide facts or lie effectively in his own or others' interests?

- Putting aside any heinousness or gruesomeness surrounding the capital offense, did the commission of that offense require forethought, planning and complex execution of purpose?

*Id.* at 8–9.

The state habeas court found, after hearing the lay testimony presented at the evidentiary hearing, that "there [wa]s no indication that [Maldonado] was considered or treated as mentally retarded by those who knew him best, either during [the] developmental period or as an adult." As the district court observed, most of the "[t]estimony about what Maldonado could not do came . . . from . . . his childhood." *Maldonado v. Thaler*, 662 F. Supp. 2d at 733. This testimony consisted primarily of evidence that Maldonado was "slow to learn" and "did not understand much" in school. *Id.* at 731. The testimony also revealed, however, that Maldonado had managed to support himself on the streets from age nine, panhandling and selling illegal drugs. The district court observed that in adulthood, despite this "disadvantaged and inhibiting

20

background, Maldonado sought better life opportunities" and in fact managed to better his life in many respects. *Id.* at 733.

The testimony at the hearing showed that Maldonado married in Mexico and fathered a child. He crossed the United States border with the aid of a "coyote" to whom he paid $300. In the United States, he worked with his father at Greenspoint Dodge in Houston, Texas, washing and waxing cars. He made "substantial money" there, including a significant amount in tips. He later obtained a second job working with his father at an apartment complex. Maldonado then returned to Mexico to retrieve his wife and child; the family successfully entered the United States illegally. The family lived together in an apartment and Maldonado was, for a time, the sole breadwinner. Maldonado subsequently worked for his cousin for several months as the cashier at a taqueria. Maldonado's work in Houston ended when he was arrested for smuggling marijuana from Mexico and was sentenced to two and a half years in a federal penitentiary. When he was released, he moved to Chicago, where he joined his wife and her family and obtained a factory job. Although the testimony showed that he did not perform his various jobs perfectly, we agree with the district court that the testimony showed that his performance was at least to a level that "belie[d] mental retardation." *Id.*

After Maldonado returned to Houston and was arrested for capital murder, he regularly wrote to his father from prison. Maldonado's experts did not review these letters, but we agree with the district court's conclusion that these, though "by no means . . . literary masterpieces, do not facially give an impression of substantial intellectual impairments." *Id.* Prison guards testified at the evidentiary hearing that Maldonado kept his cell neat and "very organized"; that he was always well-groomed; and that he properly filled out commissary requests and took good care managing that account. Maldonado also properly completed prison grievance forms.

No. 10-70003

Based on this record, we find no evidence sufficient to rebut the presumed correctness of the state habeas court's factual findings that Maldonado "formulated and carried through plans for living, i.e., panhandling as a child; coming to the United States from Mexico; working at a car dealership, an apartment complex, and a factory; transporting marijuana to the United States; and engaging in robbery and murder, albeit criminal activities." Nor does the evidence rebut the presumed correctness of the state habeas court's conclusion that Maldonado "fail[ed] to show adaptive deficits in adaptive behavior based, in part, on the applicant's history of driving, procuring and transporting drugs, sometimes working in legitimate jobs, attempting to escape detection during his criminal offenses, his interactions with others [in prison], his correspondence with others, his maintaining his commissary account [in prison], and his use of the grievance system [in prison]."[3]   In short, Maldonado has not presented

---

[3] A different result is not required by our recent decision in *Wiley v. Epps*, __ F.3d __, No. 09-70037, 2010 WL 4227405 (5th Cir. Oct. 27, 2010), a case originating in Mississippi in which lay evidence was present about the defendant's ability to drive, work, and support his family, but we affirmed the district court's holding that Wiley was mentally retarded. Courts are often confronted with similar evidence that a defendant claiming to be mentally retarded under *Atkins* can perform various activities. But the mental retardation question is very much case-specific and fact-intensive, and there are critical differences between *Wiley* and Maldonado's case. Most important, unlike the instant case, we determined in *Wiley* that the district court was not bound by the AEDPA's deferential standards and so reviewed the district court's conclusions only for clear error. *See id.*, slip op. at 20. Here we consider the reasonableness of the state habeas court's decision. We also determined in *Wiley* that the State had failed to brief, and so waived, the district court's findings on adaptive deficits. *Id.* at 30. Furthermore, Wiley presented expert evidence that mentally retarded persons could perform certain minimal functions, which did not preclude a mental retardation finding in his case, and he supported his claim of adaptive deficits with expert testing and assessments, as well as with work, school, and military records. *Id.* at 27, 30–34. In contrast, the state court in Maldonado's case was faced with only limited evidence about Maldonado's adaptive skills, no formal adaptive testing by his experts, and lay evidence that was contrary to his claims. Maldonado's case is also governed by the Texas standards for mental retardation established by *Briseno*, which specifically contemplate consideration of how the defendant is viewed by friends and family and how he has generally functioned and conducted himself. In light of the foregoing, the state court's determination in this case was neither contrary to nor an unreasonable application of federal law, nor an unreasonable determination of the facts. *See* § 2254(d).

evidence sufficient to rebut the presumption of correctness that attaches to the state habeas court's conclusion that Maldonado did not meet his burden of satisfying the second prong of the *Briseno* test.  *Cf. Woods*, 493 F.3d at 587 (concluding that presumption of correctness was not overcome where the petitioner himself had submitted little evidence of deficits, and the persuasiveness of even that evidence was "significantly diminished by the evidence of [the defendant's competent] performance" at his job).

## IV.   CONCLUSION

At the evidentiary hearing on the *Atkins* issue and in his federal habeas petition and appeal, Maldonado has emphasized the shortcomings of Dr. Denkowski's testimony.  Whatever the validity of these criticisms, however, we conclude that, discounting Dr. Denkowski's testimony in its entirety and considering only the evidence and testimony remaining in the record, this evidence does not rebut the presumption of correctness that attaches to the state habeas court's conclusion that Maldonado did not meet his burden of establishing mental retardation. Therefore, the state court's denial of relief was neither an unreasonable application of federal law nor an unreasonable determination of the facts in light of the evidence.  We AFFIRM the district court's denial of habeas relief on Maldonado's *Atkins* claim.  Maldonado's motion for a stay is DENIED.

AFFIRMED.  MOTION DENIED.