**UNITED STATES of America,**
**Plaintiff,**

v.

**Xavier JIMÉNEZ–BENCEVÍ,**
**Defendant.**

**Criminal No. 12–221(JAF).**

United States District Court,
D. Puerto Rico.

March 21, 2013.

Ilianys Rivera–Miranda, Luke V. Cass, United States Attorney's Office, District of Puerto Rico, San Juan, PR, James Dennis Peterson, United States Department of Justice, Capital Case Unit, Washington, DC, Jose Capo–Iriarte, United States Attorneys' Office, Hato Rey, PR, for Plaintiff.

Juan R. Acevedo–Cruz, San Juan, PR, for Defendant.

### MEMORANDUM OPINION

JOSÉ ANTONIO FUSTÉ, District Judge.

We must decide whether Xavier Jiménez–Benceví, a defendant facing capital charges, qualifies as mentally retarded[1]

---

1. We use the term "mental retardation" throughout because that is the phrase employed by the relevant legal authorities, including the Supreme Court. We recognize,

and, therefore, may not be sentenced to death. *See Atkins v. Virginia,* 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) (holding that the execution of mentally retarded persons constitutes cruel and unusual punishment in violation of the Eighth Amendment). After having considered the testimony and evidence presented, we conclude that Jiménez–Benceví is not mentally retarded and is therefore eligible to be tried as a capital offender.

# I.

## FACTUAL AND PROCEDURAL HISTORY

### A. Procedural History

Jiménez–Benceví was indicted on one count of murdering a federal witness in violation of 18 U.S.C. § 1512(a)(1)(C). (Indictment, Docket No. 11.) The indictment alleges that Jiménez–Benceví shot and killed Delia Sánchez–Sánchez in a grocery store parking lot after he had learned of her intent to speak to federal authorities about his involvement in a multi-city drug operation. The government gave notice that it would seek the death penalty pursuant to the Federal Death Penalty Act, 18 U.S.C. § 3591(a), and that it was authorized to do so by the Attorney General. (Docket No. 134.)

Jiménez–Benceví filed the pending motion on December 14, 2012, requesting that the court make a pretrial determination that he is mentally retarded as defined by the Supreme Court in *Atkins v. Virginia,* 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). (Docket No. 141.) Such a finding would preclude the imposition of a sentence of death pursuant to the Eighth Amendment to the U.S. Constitution and

18 U.S.C. § 3596(c). In an Order dated January 22, 2013, we scheduled a pretrial hearing and issued orders to allow Jiménez–Benceví to develop the factual basis for his claim of mental retardation. (Docket Nos. 153, 181 and 198.) On February 16, 17, and 18, we held a hearing on the motion. The case is currently scheduled for trial, with jury selection to begin on April 15, 2013. (Docket No. 367.)

### B. Expert and Lay Witness Testimony

During the three days of hearings, Jiménez–Benceví called two expert witnesses. The government called two expert witnesses and three lay witnesses. The qualifications of the expert witnesses and the relationship of each lay witness to Jiménez–Benceví are summarized below.

#### 1. Dr. Margarida

Jiménez–Benceví's first expert witness was Dr. María Margarida Juliá, Psy.D. Dr. Margarida is a licensed clinical psychologist. She received a doctorate in clinical psychology from the Massachusetts School of Professional Psychology and completed a post-doctoral fellowship in neuropsychology at Harvard Medical School. Additionally, she received a Master's of Education from Harvard University in 1980. Dr. Margarida serves as a full-time professor at the University of Puerto Rico School of Medicine. Dr. Margarida is a Fellow and member of the American Psychiatric Association, and a member of the American Neuropsychiatric Association. Her training is primarily in clinical psychology with a specialization in neuropsychiatric disorders, brain dysfunction, and child development. Dr. Margarida stated that she has performed *Atkins* assessments in eight

---

however, that many clinical associations now advocate the use of the term "intellectual disability" instead of "mental retardation" and that the federal government now mandates the use of "intellectual disability" in all federal enactments and regulations. *See* Pub. L. No. 111–256, 124 Stat. 2643 (2010).

prior federal capital cases. (Docket No. 252 at 21.) As we noted previously, Dr. Margarida does not specialize in the study or evaluation of mental retardation. *See U.S. v. Candelario–Santana,* 916 F.Supp.2d 191, 199–201, 203–04, 212, 2013 WL 101615, at *7, *10, *19 (D.P.R.2013).

### 2. *Dr. Weinstein*

Jiménez–Benceví's second expert witness was Dr. Ricardo Weinstein, Ph.D. Dr. Weinstein is a licensed clinical psychologist. He received his Ph.D. in Clinical Psychology from International College in Los Angeles, and received a post-doctoral certificate in neuropsychology from the Fielding Institute in Santa Barbara, California. Both institutions were unaccredited and have ceased operations. Dr. Weinstein is a member of the National Academy of Neuropsychology. Dr. Weinstein has limited clinical practice in the assessment and diagnosis of mental retardation. (Docket No. 253 at 181.) His primary training in intellectual disabilities comes from his service as an elementary school psychologist and as a forensic expert. (*Id.* at 159.) He does, however, have wide experience in intellectual disability assessments for *Atkins* determinations.[2] Dr. Weinstein has conducted approximately forty *Atkins*-related evaluations. (*Id.* at 180.)

### 3. *Dr. Herrera–Pino*

Dr. Jorge Herrera–Pino ("Dr. Herrera") was the first expert to testify for the government. Dr. Herrera has a Ph.D. in Educational and Clinical Neuropsychology from Wayne State University, and is a Doctor of Medicine from Universidad de Alcalá, Spain. He was a post-doctoral fellow in pediatric and clinical neuropsychology at the Universidad de Alcalá, Spain. Dr. Herrera is a member of the American Psychological Association. Dr. Herrera has a long and extensive clinical practice that has included a particular focus on the diagnostic evaluation and assessment of mental retardation. (Docket No. 347 at 8–9.) In addition to his clinical work, Dr. Herrera is the founder and director of the Miami Neurobehavioral Institute, where he oversees a team of eleven licensed neuropsychologists. Recently, he managed a five-year contract from the State of Florida, in which he and his team were responsible for evaluating 5,000 individuals for developmental disability diagnoses. A significant portion of Dr. Herrera's career has also involved consultation and teaching with institutions throughout Spain and Latin America. He is an Associate Professor and a founding member of the college of medicine at Florida International University. His involvement in the field of neuropsychology stretches some forty years. He has also testified for both the government and defense as an expert in *Atkins* hearings, including approximately ten times for the defense in habeas proceedings.

### 4. *Dr. Grodzinski–Schwartz*

Dr. Jaime Grodzinski–Schwartz ("Dr. Grodzinski") was the second government

---

**2.** As an expert witness in *Atkins* proceedings, Dr. Weinstein has a checkered history. The Fifth Circuit Court of Appeals was "troubled" with Dr. Weinstein's complete inability to explain his irregular methodology, including his failure to " 'report partial conclusions' " that contradicted the findings he submitted to the court. *Maldonado v. Thaler,* 625 F.3d 229, 239 (5th Cir.2010). In *Ortiz v. United States,* the district court found Dr. Weinstein's expert testimony "unreliable" and said that he "ap-

pears more concerned with legal culpability than with an objective assessment of intellectual capability." *Ortiz v. United States,* 2007 WL 7686126 at *2–7 (W.D.Mo. Dec. 14, 2007). In *Pizzuto v. Blades,* the district court stated that Dr. Weinstein's findings, at best, were "ambiguous" and that it found it could not "credit" his comprehensive IQ scores. *Pizzuto v. Blades,* 2012 WL 73236 at *14 (D.Id. Jan. 10, 2012).

expert to testify. Dr. Grodzinski is a clinical psychologist. Dr. Grodzinski received a doctorate and a Master's of Science in psychology, with an emphasis in neuropsychology, from Carlos Albizu University in Miami, Florida. He has also received graduate degrees and licensures in clinical psychology from institutions in Peru and Israel. Prior to his coming to Puerto Rico, Dr. Grodzinski held several clinical posts in Israel, including service as the Chief Clinical and Rehabilitation Neuropsychologist for Tel Hashomer Hospital in Tel-Aviv, Israel. Dr. Grodzinski received training in intellectual disability assessments through his service in a number of different positions, including as the Director of the Psychology Department at the State Psychiatric Hospital in Río Piedras, Puerto Rico, and as a clinical psychologist in the mental retardation program of the Puerto Rico Neuropsychiatric Unit. Presently, Dr. Grodzinski serves as a neuropsychologist examiner for the Veterans Hospital, in San Juan, Puerto Rico. Additionally, he performs clinical and forensic psychological services for several other government entities. Dr. Grodzinski is also an adjunct professor at Carlos Albizu University, and maintains a private practice. Dr. Grodzinski has testified in several *Atkins* proceedings previously and has conducted well over 6,000 assessments related to mental retardation and intellectual disability.

#### 5. *Sonia Mutt–Ortiz*

The government's first lay witness was Sonia Mutt–Ortiz, an educator with over thirty-six years of service in special education. (Docket No. 347 at 88.) Mutt-Ortiz was Jiménez–Benceví's special education teacher for a brief period of time during the semester just prior to when he dropped out of school. (*Id.* at 90.) Additionally, Mutt-Ortiz is a long-time acquaintance of Jiménez–Benceví's family. (Dock-et 248–4 at 12) Mutt–Ortiz testified about her professional observations of Jiménez–Benceví's behavioral and intellectual limitations in a formal, classroom setting. (*Id.*)

#### 6. *Juan Ramón Ríos–Polo*

The Government's second lay witness was Juan Ramón Ríos–Polo ("Ríos"). Ríos owns an automotive repair shop and works as a pastor at a Protestant church in Caguas, Puerto Rico. Ríos employed Jiménez–Benceví for a three-month span, from December 2011 to February 2012. (Docket No. 305 at 48.) During this time, Jiménez–Benceví rented a home owned by Ríos' father. (*Id.* at 64-5.) Ríos testified about the mechanical work and employee supervision he entrusted to Jiménez–Benceví.

#### 7. *Nasha N. Pazmino*

The Government's third lay witness was Nasha N. Pazmino. She is an adult female who met Jiménez–Benceví through a mutual friend. For a period of three weeks, Pazmino allowed Jiménez–Benceví to visit and reside in her home with her children. (Docket No. 248–4 at 15.) Pazmino testified regarding issues related to Jiménez–Benceví's general demeanor, social behavior, hygiene, maturity, and daily routine.

## II.

### LEGAL STANDARD FOR MENTAL RETARDATION

██ Jiménez–Benceví bears the burden of establishing mental retardation by a preponderance of the evidence. *See United States v. Smith,* 790 F.Supp.2d 482, 484 (E.D.La.2011) (allocating burden of proof to defendant by preponderance of the evidence standard and resolving before trial); *United States v. Sablan,* 461 F.Supp.2d 1239, 1242 (D.Colo.2006) (establishing

same burden of proof and ruling that determination be made before trial).

Two provisions of law forbid federal courts from imposing a death sentence upon a person who is mentally retarded. First, the Federal Death Penalty Act ("FDPA"), originally enacted by Congress in 1988 and amended in 1994, provides that a "sentence of death shall not be carried out upon a person who is mentally retarded." 18 U.S.C. § 3596(c). Second, the execution of mentally retarded individuals violates the Eighth Amendment's ban on "cruel and unusual punishments." *Atkins*, 536 U.S. at 321, 122 S.Ct. 2242; *see also* U.S. Const. amend. VIII ("Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.").

In *Atkins*, the Court held that a national consensus had developed against executing persons with a "known IQ less than 70," a practice that had become "truly unusual." *Atkins* at 316, 122 S.Ct. 2242. The Court emphasized that the conception of mental retardation covered by this national consensus included "mild" mental retardation, a clinical condition "typically used to describe persons with an IQ between 50–55 and approximately 70." *Id.* at 308 n. 3, 122 S.Ct. 2242 (citing American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders: DSM–IV 42–43 (4th ed. 2000) (hereinafter DSM–IV)). According to the Court, mental retardation requires "subaverage intellectual functioning ... significant limitations in adaptive skills such as communication, self-care, and self-direction that became manifest before age 18." *Id.* at 318, 122 S.Ct. 2242.[3]

## III.

## ANALYSIS

### A. Prong One: Significant Limitations in Intellectual Functioning

In *Atkins*, the Court observed that "an IQ score of between 70 and 75 or lower" is "typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition." *Id.* at 309 n. 5, 122 S.Ct. 2242 (citing 2 Kaplan & Sadock's Comprehensive Textbook of Psychiatry 2952 (B. Sadock and V. Sadock eds. 7th ed. 2000)). The five-point range referenced by the Court reflects the fact that each comprehensive intelligence testing instrument has its own standard error of measurement, or the measure of difference between an obtained score and its theoretical true score counterpart. The standard error of measurement varies across test instruments and age ranges. (Docket No. 250–1 at 7.) Because Jiménez–Benceví's IQ scores do not fall below the threshold score of 70 according to any reliable expert evaluation, we hold that he fails to satisfy the requirements of prong one.

### 1. Jiménez–Benceví's IQ Scores

Jiménez–Benceví was administered an extensive assortment of tests measuring his cognitive functioning—both by his own expert and by experts acting on behalf of the government. Altogether, we were given the results obtained from the administration of three comprehensive intelligence tests: The Escala de Inteligencia de

3. It is important to note that while "the Supreme Court in *Atkins* could have adopted the clinical standard" for defining and evaluating mental retardation, "it explicitly declined to do so." *Hooks v. Workman*, 689 F.3d 1148, 1168 (10th Cir.2012). Though the clinical standards have informed our analysis, we emphasize that "a clinical standard is not a constitutional command." *Id.* Therefore, in evaluating Jiménez–Benceví's claim, we have taken our primary guidance from the Supreme Court in *Atkins* and the expert testimony given at the hearing.

Wechsler para Adultos—Tercera Edición (EIWA–III); the Woodcock–Muñoz Batería III (Batería III); and the Escala de Inteligencia de Wechsler para Niños–Revisada–Puerto Rico (EIWN–R–PR), administered when Jiménez–Bencevi was age sixteen.

Dr. Margarida administered the EIWA–III. She testified that the EIWA–III was the only comprehensive intelligence test that she administered to Jiménez–Bencevi.[4] The EIWA–III is recognized as a model tool for intelligence testing among Spanish-speakers. *See* Nicholas S. Thaler & Sharon Jones–Forrester, *IQ Testing and the Hispanic Client* in GUIDE TO PSYCHOLOGICAL ASSESSMENT WITH HISPANICS, 88 (Lorraine T. Benuto, ed., 2012). The EIWA–III is a Spanish-language adaptation of the Wechsler Adult Intelligence Scale–Third Edition (WAIS–III), and it includes the subtests and constructs that are the foundation of WAIS–III testing. *Id.* However, unlike the WAIS–III, the EIWA–III was adapted and standardized specifically to Puerto Rico. The third edition was developed in cooperation with the Ponce School of Medicine in Puerto Rico to ensure the language and items were culturally appropriate for Spanish-speaking Puerto Ricans. *See* Brigida Hernandez, Elizabeth Horin & et alia, *Psychological Testing and Multicultural Populations* in RACE, CULTURE, AND DISABILITY: Rehabilitation Science and Practice (Fabricio E. Balcazar, Yolanda Suarez–Balcazar, et alia eds., 2010).

The EIWA–III was the current version of the test at the time Dr. Margarida assessed Jiménez–Bencevi. The test administered by Dr. Margarida consisted of a global scale and several subscales or subtests, grouped into two general categories, "verbal" and "performance". Dr. Margarida reported that Jiménez–Bencevi obtained a Full Scale IQ of 57, with a Verbal IQ of 57 and a Performance IQ of 69. (Docket No. 250–1 at 22.)

In February of 2013, Dr. Weinstein administered the Batería III to Jiménez–Bencevi. The Batería III Pruebas de Habilidades Cognitivas–Extendida is the Spanish-language version of the Woodcock–Johnson III Tests of Cognitive Abilities. It is a comprehensive set of tests that assesses both cognitive abilities and achievement levels of Spanish-speaking individuals. (Docket No. 304 at 105.) Dr. Weinstein reported that Jiménez–Bencevi obtained a Full Scale IQ of 74, with a Verbal IQ of 77 and a Performance IQ of 76.

In 2000, Jiménez–Bencevi, then aged fifteen, was referred to Dr. Carmen Rullán, a psychologist at Centro Educativo Joaquina de Vedruna, because "he was 'not retaining material taught in class.'" (Def. Exh. 6.) As part of her assessment of Jiménez–Bencevi, Dr. Rullán administered the EIWN–R–PR. Jiménez–Bencevi obtained a Full Scale IQ of 79. (Docket No. 304 at 4.) Dr. Rullán did not diagnose Jiménez–Bencevi as mentally retarded. (*Id.* at 5.) This score stood without alteration or adjustment for twelve years.

However, during the course of their work as defense experts, Drs. Margarida and Weinstein contacted Dr. Rullán on several occasions asking her to revisit her work. (*Id.* at 4.) According to Dr. Margarida, Dr. Rullán incorrectly scored one of the EIWN–R–PR subtests, "Object As-

---

4. Nonetheless, on page 22 of her report is a table of results, including scores scaled for the WAIS III intelligence test. (Docket No. 250–1.) These two assessments are independent of one another. Because she did not actually administer the WAIS–III (Docket No. 304 at 20.) to Jiménez–Bencevi, we decline to consider the scaled WAIS–III scores included in Dr. Margarida's report.

sembly." After reviewing her work alongside Dr. Margarida, Dr. Rullán agreed to adjust the original score and subtract six points from Jiménez–Benceví's Performance Scale, thus lowering his comprehensive IQ score. (*Id.* at 7.) Later, Dr. Weinstein contacted Dr. Rullán and encouraged her to revisit the assessment once more and to consider further downward adjustments to the score. At Dr. Weinstein's urging, Dr. Rullán issued a declaration stating that she may have also made errors in the tabulation of the "Picture Arrangement" test. (Docket No. 250–4.) According to Dr. Rullán, if these errors were appropriately considered, Jiménez–Benceví's IQ score would be reduced another few points, falling to an overall score of 72. (*Id.*) However, in a supplemental report filed by Dr. Grodzinski, the government's expert suggests that Dr. Rullán's errors include a failure to adequately credit certain answers that would have warranted an upward revision from the original score of 79. (Docket No. 248–3.) According to Dr. Grodzinski, if Dr. Rullán had administered the EIWN–R–PR according to the official test publisher's manual, Jiménez–Benceví would have been credited with a comprehensive IQ score of 80, placing him "within a low average intelligence and not in a Mental Retardation level." (*Id.* at 2.)

The only thing clear from Dr. Rullán's work, then, is that it is disputed. We have no doubt that clinicians make mistakes and the parties are free to argue about the significance of those mistakes. But what is troublesome here is that defense counsel's experts insisted on contacting Dr. Rullán personally to produce changes to the old score, rather than simply arguing in open court about the reliability of the old score.

This course of conduct may not be an outright violation of professional ethics but it certainly strikes us as discordant. Asking another professional to revisit work performed twelve years earlier, merely to secure a result more convenient for the present purposes, is an inadvisable practice: It raises the appearance of undue influence and it undermines the credibility of the new conclusions, revised under pressure. We will not countenance this sort of mischief; we consider the whole constellation of revisions to Dr. Rullán's original score, but we refuse to blindly credit these revisions, departures, corrections, or amendments—all of which appear to be the product of badgering and persuasion, not an individual's honest assessment of her own work and its potential flaws. We assume, for the purposes of our analysis, that Jiménez–Benceví's overall IQ score on the 2000 administration of the EIWN–R–PR was 76.

### 2. Criticism of EIWA–III IQ Score by Dr. Herrera

In order to assess the credibility of the score Jiménez–Benceví obtained on the EIWA–III, Dr. Margarida employed a variety of instruments designed to detect "suboptimal performance," or, malingering—the feigning or "exaggeration of symptoms for a secondary gain." (Docket No. 305 at 36.) In her report, Dr. Margarida indicated that the results obtained from these instruments clearly demonstrated that Jiménez–Benceví gave "adequate levels of cooperation and effort" and that his scores on the EIWA–III were a "valid indication of [Jiménez–Benceví's] present level of functioning." (Docket No. 250–1 at 20.)

One of the instruments used by Dr. Margarida to determine if Jiménez–Benceví exhibited any signs of malingering was the Rey 15 Item Test. (Docket No. 250–1 at 20.) Jiménez–Benceví scored a three on one of the three elements of this

test. Dr. Herrera notes in his report that a score of three is "substantially below the cutoff score of nine usually employed with this task." (Docket No. 248–4 at 5.) Dr. Margarida neglected to make note of this irregular score.

Moreover, Dr. Margarida could not account for the results from the other two elements of the Rey 15 Item Test. The only data we have from her administration of this test is the element that Jiménez–Benceví obtained a score of three. Dr. Margarida lost the scores from the other two elements. (Docket No. 304 at 30.) We note that, inexplicably, the last time Dr. Margarida came before this court she had also misplaced data sets from her administration of assessments designed to detect malingering, including on the Rey 15 Item Test. (*Id.*)

In her final report, Dr. Margarida recorded that Jiménez–Benceví obtained an overall score of 20 on the Rey 15 Item Test. The maximum score possible on this test, however, is 15. When questioned about this scoring anomaly, Dr. Margarida indicated that it was an error on her part. (*Id.*)

Curiously, Jiménez–Benceví performed satisfactorily on the much more difficult Test of Memory Malingering (TOMM). According to Dr. Herrera, that Jiménez–Benceví scored well on a difficult assessment but performed substantially below expectations on a relatively easy assessment is a clear indication of malingering. (Docket No. 248–4 at 5.)

Dr. Margarida administered the Mini Mental Status Examination, or Folstein Test. (Docket No. 250–1 at 19.) The Mini Mental Status Examination is most commonly used as a test to screen for cognitive impairment with patients suffering from dementia. In his report, Dr. Herrera notes that a baseline score on this instrument for patients with Alzheimer's type

dementia is 24. (Docket No. 248–4 at 6.) Dr. Margarida reported that Jiménez–Benceví obtained a total score of 11. Dr. Herrera notes that this score is "so poor that it is not even consistent with the presence of *mild* mental retardation" (emphasis added) and stands as one more marker of an "attempt at feigning or malingering cognitive dysfunction and intellectual disability." (*Id.*)

Dr. Margarida also administered the Rey Word Recognition Test, another instrument used by clinicians for the detection of suspect effort. *See* Stephen Nich, Kyle Brauer Boone, Johnny Wen, et alia, *The Utility of the Rey Word Recognition Test in the Detection of Suspect Effort,* The Clinical Neuropsychologist 20; 873–887 (2006). The instrument asks the test-taker to identify fifteen words from a collection of thirty total words. Jiménez–Benceví was able to correctly identify nine out of the fifteen words presented to him by Dr. Margarida. Dr. Herrera states that the results obtained by Jiménez–Benceví on this test are entirely inconsistent with Dr. Margarida's findings from the Mini Mental Status examination, where she indicated Jiménez–Benceví was unable to repeat simple phrases or to read simple instructions out loud. (Docket No. 248–4 at 7.) Dr. Herrera noted that such reading capacities were inconsistent with the low scores that he obtained on the Woodcock–Muñoz achievement test. (*Id.*)

We suggest there are two possible explanations for these alarming inconsistencies: (1) Dr. Margarida's scoring errors, inconsistent findings and haphazard custodianship of Jiménez–Benceví's testing data can be blamed on professional incompetence; or, in the alternative, (2) Dr. Margarida voluntarily misrepresented Jiménez–Benceví's appropriate effort in an effort to lend undeserved credibility to the score he obtained on her administration of

the EIWA–III. In any event, we will not hazard a guess at the explanation because the point remains the same: There are too many inconsistencies and irregularities to credit Dr. Margarida's finding that Jiménez–Bencevi was not malingering. As such, we find the score she reported from her administration of the EIWA–III to lack sufficient reliability and we decline to consider it.

### 3. The "Flynn Effect"

We find it important to clarify our prior refusal to entertain "Flynn Effect" adjustments to any scoring administered by either the government or defense experts because the same principle applies here. *See Candelario–Santana,* 916 F.Supp.2d at 207–08, 2013 WL 101615, at *14 (D.P.R. Jan. 8, 2013). As we noted previously, the Flynn Effect is a phenomenon named for James R. Flynn, who postulated that the population's mean IQ score rises over time, by about a third of a point each year. According to Flynn, if an individual's test score is measured against a mean of a population sample from prior years, then that individual's score will be inflated to varying degrees (depending on how long ago the sample was first employed) and will not provide an accurate indication of his actual IQ. *See, e.g., Walton v. Johnson,* 440 F.3d 160, 177 n. 22 (4th Cir.2006) (en banc) ("The premise of the 'Flynn Effect' is that IQ scores increase over time and that IQ tests that are not renormed to take into account rising IQ levels will overstate a testtaker's IQ score."); *see also* James. R. Flynn, *Tethering the Elephant: Capital Cases, IQ, and the Flynn Effect,* 12 PSYCHOL. PUB. POL'Y & L. 170, 172 (2006) ("Naturally, judges want to know whether defendants were actually two standard deviations below their peers at the time they were tested and not how they rank against a group selected at some random date in the past." (emphasis added)). *See generally* James R. Flynn, *The Mean IQ of Americans: Massive Gains 1932 to 1978,* 95 PSYCHOL. BULL. 29 (1984). Flynn posited that a downward adjustment to scores is necessary when a test lacking current norms is used. *See* Flynn, *Tethering the Elephant, supra* at 174–75.

However, the Flynn Effect remains highly controversial and many courts have declined to accept its application. *See Thomas v. Allen,* 607 F.3d 749, 757 (11th Cir.2010) ("[T]he Flynn Effect is a statistically-proven phenomenon, although no medical association recognizes its validity."); *Maldonado v. Thaler,* 625 F.3d 229 (5th Cir.2010) ("Neither this court nor the [Texas Criminal Court of Appeals] has recognized the Flynn Effect as scientifically valid."); *Williams v. Mitchell,* 2012 WL 4505774, *34–36 (N.D.Ohio 2012) (holding that a state court's failure to adjust an IQ score to take into account the Flynn Effect was not contrary to clearly established federal law for purposes of 28 U.S.C. § 2254(d)(1); "[C]ourts have held that 'there is no scientific consensus' on the validity of the Flynn Effect."); *see also* Jon Martin Sundet, Dag G. Barlaug, Tore M. Torjussen, *The End of the Flynn Effect?* INTELLIGENCE 32; 349–362 (2004); Leigh D. Hagan, Eric Y. Drogin and Thomas J. Guilmette, *IQ Scores Should Not Be Adjusted for the Flynn Effect in Capital Punishment Cases,* JOURNAL OF PSYCHOEDUCATIONAL ASSESSMENT (2010); Alan S. Kaufman, *In What Way Are Apples and Oranges Alike? A Critique of Flynn's Interpretation of the Flynn Effect,* JOURNAL OF PSYCHOEDUCATIONAL ASSESSMENT (2010); Michael Shayer and Demse Ginsburg, *Thirty Years On—A Large Anti-Flynn Effect?,* BRITISH JOURNAL OF EDUCATIONAL PSYCHOLOGY (2009).

The government's experts testified that they were unaware of any professional consensus about the use of the Flynn Ef-

fect. (Docket No. 347 at 52.) Moreover, the government's experts stated that, conceptually, the Flynn Effect was not intended to be applied every year after the publication of an assessment, but was rather intended to offset changes that might occur in scoring once an assessment was older than a generation. (*Id.*)

As the government's experts clearly demonstrated, the EIWA–III test, recently revised in 2008, was not an old test in need of being "renormed" when it was administered to Jiménez–Benceví. Similarly, when the EIWN–R–PR was administered to Jiménez–Benceví in 2000, it was not an old test, having been published in 1992. (Docket No. 248–3 at 1.) In other words, at the time they were administered, none of the tests taken by Jiménez–Benceví were out-of-date or reliant upon old norms and, therefore, any scores obtained by Jiménez–Benceví do not need Flynn Effect adjustments.

Finally, in reviewing the prior work of the defense experts, we note an inconsistent application of the Flynn Effect. (Docket No. 304 at 22.) To begin, when applying the Flynn Effect both defense experts made sloppy calculation errors. (*Id.* at 18–19.) We note this only because both defense experts spoke at length of the importance of the Flynn Effect. Something of such importance should not be so sloppily done.

Additionally, neither Dr. Margarida nor Dr. Weinstein, despite initially testifying to the contrary, uses the Flynn effect in every case. (Docket Nos. 304 at 13; 305 at 4–6.) Rather, Dr. Margarida admits that she uses the Flynn Effect in death penalty cases when "a single point is the difference between life and death." On cross-examination, it was pointed out to Dr. Weinstein

that in several recent cases he had not included Flynn Effect adjustments to the scores he reported.[5] It cannot be the case that the Flynn Effect is "best practices" (Docket No. 304 at 13) or a standard feature of clinical procedure but that it is only selectively applied when it produces results amenable to an individual clinician's task.

The Flynn Effect remains controversial among scientific experts. Courts of law are not in the business of endorsing one side or the other in a scientific controversy. Instead, we look to ground our decisions on reliable sources. The Flynn Effect is sufficiently controversial as to be unreliable. Under such circumstances, the Flynn Effect has no relevance to our inquiry and we agree with the government's experts that it should not apply here. *See Hooks,* 689 F.3d at 1170 (concluding that neither *Atkins* nor any other U.S. Supreme Court decision mandates the application of the controversial Flynn Effect).

#### 4. *Conclusion*

We have considered the different professional determinations submitted by Drs. Margarida, Weinstein, Rullán, Herrera, and Grodzinski, recognizing that each professional assessment reflects both the art and the science of psychological evaluation. Given all of the testimony we have heard, we conclude that the best explanation of the data before us is that Jiménez–Benceví does not exhibit sub-average intellectual functioning.

### B. *Prong Two: Limitations in Adaptive Functioning*

■ In the third footnote in *Atkins*, the Court described the key features of

5. We are not the first court to notice the discrepancy between Dr. Weinstein's testimony as an expert and his practice as a clinician.

*See Martinez Ramirez v. Ryan,* 2010 WL 3854792 at *14 (D.Az. Sept. 28, 2010).

adaptive behavior deficits, tracking language from the clinical guidelines published by the AAMR and the APA. *Atkins, Id.* at 308 n. 3, 122 S.Ct. 2242. According to the AAMR definition, a person meets prong two if he has "related limitations in two or more of the following adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work." *Atkins,* 536 U.S. at 308 n. 3, 122 S.Ct. 2242 (citing Mental Retardation: Definition, Classification, and Systems of Supports 5 (9th ed. 1992)). The APA definition holds that a person meets prong two if he has "significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety." *Id.* (citing DSM–IV 41 (4th ed. 2000)). As one district court has observed, the two classifications "essentially measure the same skills."[6] *United States v. Davis,* 611 F.Supp.2d 472, 490 (D.Md.2009).

Because of the relative subjectivity of the adaptive behavior analysis, clinical judgment is of significant importance. When assessing adaptive behaviors, therefore, courts must make their own independent determinations of the clinicians' judgment and credibility.[7] *See Davis,* 611 F.Supp.2d at 491 (noting importance of assessing information that goes to "the relative credibility of the experts" in the

case); *Smith,* 790 F.Supp.2d at 505 ("the Court must rely on its assessment of the relative competence and credibility of the individual experts"). After considering both sets of expert reports, we find that Jiménez–Benceví has failed to show that he has adaptive behavior limitations.

### 1. Dr. Margarida's Report

Dr. Margarida provided a "Report" and "Addendum" describing her findings. (Docket Nos. 250–1, 250–2.) Dr. Margarida's report provides a specific "Adaptive Assessment" beginning on page twenty-seven. (Docket No. 250–1 at 27.) There, Dr. Margarida discusses the tools and methods she used to assess Jiménez–Benceví's adaptive behavior limitations. (*Id.*) In addition to her clinical interviews with Jiménez–Benceví, Dr. Margarida met with the following people: Ms. Mutt–Ortiz; Dr. Rullán, Jose Luis Morales, and Virgenmina Rivera, both employees of Centro Educativo Joaquina de Vedruna; Roberto Nieves, Jiménez Benceví's former employer; two of Jiménez Benceví's sisters, Brenda and Bianca, and his mother, Milagros; and Jiménez–Benceví's long-term girlfriend, Raquel Rosa Rivera, as well as Raquel's mother, Lydia Rivera. (*Id.* at 2–3.) Of the various people she interviewed, Dr. Margarida asked Jiménez–Benceví's sister, Brenda Jiménez, to complete the Vineland–II Adaptive Behavior Scales test ("Vineland"). In addition to examining his available school records and standardized

**6.** The district court in *Davis,* 611 F.Supp.2d at 475 n. 1, referred to the 2002 "AAMR Manual," as well as the supplemental AAMR "User's Guide," published in 2007 (citing AAMR, MENTAL RETARDATION: DEFINITION. CLASSIFICATION, AND SYSTEMS OF SUPPORT 8 (10th ed. 2002); MENTAL RETARDATION: DEFINITION, CLASSIFICATION AND SYSTEMS OF SUPPORT (2007)). We see no great difference between the definitions of adaptive behaviors provided by the Court in *Atkins* and the later Manuals.

**7.** This function has long been performed by district courts when weighing the testimony of dueling experts. *Bruce v. Weekly World News.* 310 F.3d 25 (1st Cir.2002) ("Accordingly, the district court, qua factfinder, was entitled to make the crucial credibility determination as between the competing expert witnesses.").

tests, Dr. Margarida also considered developmental and etiological factors present in Jiménez–Benceví's background. (*Id.* at 30.) Based on all of this information, Dr. Margarida concluded that Jiménez–Benceví met the clinical definitions of mental retardation. (*Id.* at 27–31.) However, we are unable to credit Dr. Margarida's assessment of . Jiménez–Benceví's adaptive behavior.

First, Dr. Margarida's method of administering the Vineland assessment was fundamentally unreliable. To begin, Dr. Margarida's report provides little justification to support her contention that Brenda was a reliable person to serve as an interlocutor for this assessment. The memories Brenda had of Jiménez–Benceví were at least ten years old, raising doubts about their reliability. Moreover, like many of the people Dr. Margarida interviewed, Brenda had a clear incentive to provide answers that were helpful to her brother, Jiménez–Benceví. Dr. Margarida did not choose to interview any of the people whose testimony was most unhelpful to her conclusion, including, for example, Ríos–Polo or Pazmino.

In her report, Dr. Margarida repeatedly cites the work of Dr. John Gregory Olley, an expert with the APA's Division 33 ad-hoc committee on mental retardation and the death penalty. (Docket No. 250–1 at 6, n.3, 9 n.11, 14.) But, even under the terms prescribed by Dr. Olley, Dr. Margarida has failed to follow standard best practices. As Dr. Olley notes, "the process of assessing adaptive behavior, particularly in a retroactive sense, 'is a matter of drawing information from many sources, all of which are imperfect.'" *Davis*, 611 F.Supp.2d at 492 (quoting J. Gregory Olley, The Assessment of Adaptive Behavior in Adult Forensic Cases: Part 2, Psychology in Mental Retardation and Development Disabilities (American Psychological Association/Division 33, Washington, D.C.) (Fall 2006)). Faced with these difficulties, courts have adhered to the "relative consensus that the best way to retroactively assess defendant's adaptive functioning is to review the broadest set of data possible, and to look for consistency and convergence over time." *Davis*, 611 F.Supp.2d at 492 (reviewing literature on best practices for assessing adaptive behavior). In no sense did Dr. Margarida consult the "broadest set of data possible." *Id.*

Both of the government's experts testified that Dr. Margarida placed undue reliance on her retrospective use of the Vineland to evaluate Jiménez–Benceví as he was at age seventeen. In fact, Dr. Herrera wrote that he detected no "systematic attempt on her part to determine if the defendant had current impairments or adaptive limitations." We agree that this was a "crucial" error. (*Id.*) For example, a photograph of Jiménez–Benceví from before his capture shows Jiménez–Benceví sitting in a chair at a police station in Caguas.[8] Jiménez–Benceví was in the Caguas police station being interviewed by law enforcement. (Docket No. 304 at 67–68.) The officers took a photo of him. Prosecutors believe that he gave a false name and was allowed to leave the station. In the photo, Jiménez–Benceví is wearing a pressed, collared shirt and designer glasses, with his hair slicked back. His presentation is, as Pazmino would later testify, meticulous. An employee of the local law enforcement agency is sitting on the other side of the table from him, with her hands resting on her cheeks. Jiménez–Benceví is shown manipulating a cellular phone. At the very least, tracking the criteria from prong two, we think this pho-

---

8. This photograph was entered into evidence as Government's Exhibit 2. The prosecutor and Dr. Margarida discuss the photograph at pages 68–71 of Docket No. 304.

to would have to be considered as some proof of the Defendant's self-care, interpersonal skills, and self-direction. (Docket No. 304 at 69–70.) Dr. Margarida refused to consider this photograph at any point in her analysis and, when examined, refused to acknowledge that the photograph might illustrate Jiménez–Benceví's current adaptive strengths. (Docket No. 248–4 at 7.)

Second, Dr. Margarida failed to evaluate Jiménez–Benceví's present-day adaptive behavior, as required to ground a finding of adaptive behavior deficits under prong two. Dr. Margarida neglected to analyze several examples of Jiménez–Benceví's adaptive behavior strengths. (Docket No. 304 at 70–85.) These include that Jiménez–Benceví: Evaded capture by the police and survived as one of Puerto Rico's most wanted fugitives; used a Facebook account, smart phone, and text messaging services; acquired and used false identifications in two separate jurisdictions; traveled to and from the island to the mainland; founded a business enterprise in Miami; accessed and received funds at ATM machines and Western Union stations; installed a plumbing mechanism to obtain an illegal water supply to Pazminö's house; demonstrated relatively sophisticated carpentry and home improvement skills; worked as a car mechanic. (Id.)

During cross-examination, Dr. Margarida was unwilling to acknowledge that any of these behaviors might militate against a diagnosis of mental retardation. (Id.) Instead, Dr. Margarida tried repeatedly to justify her decision to ignore such evidence—mostly by stressing the notion that people who are mentally retarded with higher IQ scores "typically demonstrate strengths in functioning alongside relative limitations" (Docket No. 251 at 8) and that a person with mental retardation could learn these skills given the proper environment and supporting instruction. (Id.) Dr. Margarida was unable to point to evidence that Jiménez–Benceví had received any support or instruction in the many areas in which he was proficient. (Docket No. 304 at 70–85.) For example, Dr. Margarida could not cite to any evidence that anyone had taught Jiménez–Benceví carpentry skills or how to use the internet or process wire transfers. (Docket No. 304 at 78–83.) But, Dr. Margarida admitted that she did not know whether Defendant had prior experience in these areas. We think that Dr. Margarida drew exactly the opposite inference from the available evidence. In the absence of any sign that Defendant received training in these areas, the most appropriate explanation is that he learned how to do them on his own. Dr. Margarida's failure even to consider whether this may have been the case undermines the credibility of her analysis. We simply cannot agree that these behavior strengths are not relevant to whether a person has adaptive behavior limitations. Using the criteria from *Atkins*, we think it clear that many of the activities the government mentioned would have some bearing on a person's "communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction ... work, leisure, health, and safety." *Atkins*, 536 U.S. at 318, 122 S.Ct. 2242 (citing DSM–IV 41 (4th ed.2000)).

In fact, of this list of the DSM–IV criteria, Jiménez–Benceví could show credible evidence of really only one adaptive behavior limitation: Functional academic skills. Dr. Margarida placed great emphasis on Jiménez–Benceví's poor grades and the substandard scores he received in his intelligence testing. (Docket No. 250–1. at 29.) But, as the government ably demonstrated, those poor scores are just as easily explained by Jiménez–Benceví's troubled youth, oppositional attitude, poor attendance at school, and general lack of effort.

**374**

It is undisputed that Jiménez–Benceví endured an extremely difficult childhood—made worse by severe poverty, physical and emotional abuse, and poor educational support. We find these explanations, however, are far more persuasive for Jiménez–Benceví's poor academic functioning than any claim of mental retardation.

### 2. *Dr. Weinstein's Report*

Dr. Weinstein provided a "Declaration" and a "Supplemental Declaration" that describe his investigation and findings. (Docket Nos. 250–3, 250–6.) In addition, Dr. Weinstein has provided copies of two documents: An evaluation of Defendant done by Dr. Rullán of Centro Educativo de Vedruna, and a declaration by Sonia Mutt–Ortiz, the special education teacher who had Defendant in her class in 2000. (Docket Nos. 250–4, 250–5.) We have reviewed Dr. Weinstein's report, his supporting documents, and his in-court testimony. We reject Dr. Weinstein's conclusion that Jiménez–Benceví meets prong two of the mental retardation definition under *Atkins*.

At the outset, we should note that we found Dr. Weinstein's testimony to be substantially biased and dishonest. His lack of professionalism is exemplified in his conduct toward Mutt–Ortiz, a special education teacher who disagreed with his diagnosis. Dr. Weinstein interviewed Mutt–Ortiz and mentioned his interview very briefly in his "Declaration." (Docket No. 250–3 at 8.) In his "Declaration," Dr. Weinstein explains that Mutt–Ortiz had very limited contact with Jiménez–Benceví. Dr. Weinstein then states that Mutt–Ortiz "wanted to make sure that her comments presented in the right context and to that effect she provided a declaration that is

attached." (*Id.*) Attached to Dr. Weinstein's "Declaration" is a statement signed by Mutt–Ortiz. (Docket No. 250–5.) The statement is written in a formal, legal construction. (*Id.*) It is obvious from reading the statement that it is not the type of declaration typically prepared by a nonlawyer such as Mutt–Ortiz. The relevant sections of points seven, nine, and ten read as follows:

> I cannot give an opinion regarding [Defendant's] intellectual abilities or for learning within the academic realm. . . .

> I know that a diagnosis of mental retardation can be done in conjunction with a diagnosis of Attention Deficit Hyperactivity Disorder (ADHD) and a diagnosis of Oppositional Defiant Disorder. . . . I do not now have, nor did I have at the time during which I knew Xavier, sufficient information to give an opinion regarding his possible mental retardation diagnosis. Only the persons who have examined him with the necessary instruments for making that determination can do so.

(Docket No. 250–5.)

The declaration concludes with the following statement: "I declare under oath that the preceding is true and correct." (*Id.*) Ortiz' signature appears on the dotted line.[9] (*Id.*) As we later learned during Mutt–Ortiz' in-court testimony, this "declaration" was not reflective of what she had told the defense experts. In fact, Mutt–Ortiz took great umbrage at the suggestion that she could not give an opinion regarding Jiménez–Benceví's mental retardation. (Docket No. 347 at 101.) In response to that assertion, Mutt–Ortiz stated: "That goes against my having been a teacher for 3[6] years . . . If I were not

---

9. In addition to the contradictions listed above, the declaration was signed "under oath" despite the fact that, in court, Ortiz refused to swear an oath citing her religious beliefs. (Docket No. 88.).

capable of giving an opinion, then I couldn't be a teacher, because that's what we work with." (*Id.*) Mutt–Ortiz also testified that she told Dr. Weinstein that she was certain that Jiménez–Benceví was not mentally retarded. (*Id.* at 98.) In Mutt–Ortiz' words, Dr. Weinstein "wanted to make me believe that [Defendant] . . . was, in fact, mentally retarded." (*Id.* at 98.) According to Mutt–Ortiz, her exchange with Dr. Weinstein went on for about one and a half hours. Eventually, Dr. Weinstein left and told Mutt–Ortiz that he would return the next day.

The next day, Dr. Weinstein arrived at her house, accompanied by a defense attorney, Laura Maldonado, and two other people. Mutt–Ortiz had the impression that they were in a rush. They told her that they had prepared a summary of their conversation from the day before, and they asked her to sign. Mutt–Ortiz says that she was not even given enough time to read the entire declaration over before she was asked to sign it. (Docket No. 347 at 99.) The whole process took approximately three minutes. (*Id.*) After skimming the first few points, and noting that they seemed accurate, Mutt–Ortiz signed the form. Only after the fact did Mutt–Ortiz notice that the "declaration" contained conclusions that directly contradicted what she believed and what she had told Dr. Weinstein. (*Id.* at 99, 103.)

The contradictions between Mutt–Ortiz' version of events and Dr. Weinstein's are stark. Yet, in his testimony, Dr. Weinstein maintained that the declaration was based on Mutt–Ortiz' own words. (Docket No. 253 at 184–186.) This assertion seems to us blatantly false. We found Mutt–Ortiz to be a very credible individual. Her demeanor on the stand was firm and principled. Her thirty-six years of teaching experience in Puerto Rico's schools, as well as her deep familiarity with Jiménez–Ben-

ceví's family, lent additional weight to her testimony. We have little difficulty concluding that her version of these events is more credible than Dr. Weinstein's.

Dr. Weinstein's misrepresentation of Mutt–Ortiz' professional opinions was irresponsible. The defense attorney who drafted the declaration also bears significant responsibility for this blunder. (Docket No. 347 at 118–120.) As we stated in court, it is completely unacceptable for an attorney to present this kind of statement to a witness and ask her to sign "under oath." This type of statement, if it is to be prepared at all, should be characterized as an affidavit. There was no legal basis for characterizing this statement as "under oath." There was not even a notary present when Mutt–Ortiz signed this document. (*Id.*) That Mutt–Ortiz had religious objections to signing under oath; that she was not even given enough time to read the statement; and that the statement was virtually the opposite of what she believed, all make this error even more significant. In the future, counsel should abide by professional and ethical norms and refrain from engaging in this type of behavior.

Considering this conduct, as well as Dr. Weinstein's improper contact with Dr. Rullán, there were ample reasons to discredit Dr. Weinstein's analysis because of his apparent bias and unprofessionalism. But, even if we were to assume that Dr. Weinstein was acting in good faith, we would disagree with many of the conclusions he drew from the available evidence.

First, almost every example that Dr. Weinstein gives of Jiménez–Benceví's adaptive behavior strengths is followed by a qualification meant to lessen the positive significance of the action. The pattern in his report is the same one that Dr. Weinstein emphasized during his in-court testimony. (Docket No. 305 at 19–26.) For

example, in his "Declaration," Dr. Weinstein notes that Jiménez–Benceví obtained a Florida driver's license that was based on false identification. (Docket No. 250–3 at 9.) This seems significant in part because it demonstrates a level of planning and executive function sophisticated enough to allow Jiménez–Benceví to evade capture by law enforcement. But Dr. Weinstein does not even consider whether this might be a sign of positive adaptive behaviors. Instead, he writes: "[Pazmino] transported him to the court house where the defendant obtained a Florida driver's license. The process took only a few minutes. The defendant did not have to pass a written or driving test. He did not have to fill any forms he just signed a paper." (Docket No. 250–3 at 9.) Dr. Weinstein also notes that Jiménez–Benceví opened an account and received money deposits at Bank of America. Jiménez–Benceví used online banking and received frequent wire transfers from his business associates. Again, Dr. Weinstein minimizes these adaptive behaviors by emphasizing that Pazmino drove him to the bank and to the ATM machines. (Id.) There were several more examples of this type of adaptive behavior that Dr. Weinstein discounted. On cross-examination, the government also asked Dr. Weinstein about the fact that Defendant owned two houses and received rental income from one of them. Dr. Weinstein found this insignificant as well, noting that the houses were "run down." (Docket No. 305 at 43–44.) Instead of analyzing each activity and considering what they might indicate about Jiménez–Benceví's adaptive behaviors, Dr. Weinstein simply minimizes their significance with short declarative sentences.

Even Jiménez–Benceví's installation of an illegal plumbing mechanism, that provided water to Pazmino's entire house, did not impress Dr. Weinstein. Dr. Weinstein writes that this task was simply a matter of cutting a hose, plugging it in, and gluing it. (Id. at 10.) According to Dr. Weinstein, the installation of the mechanism—even the cutting of the hose—required no tools. (Id.) Pazmino contradicted Dr. Weinstein's account. She described how Jiménez–Benceví, on his own accord, planned and developed this mechanism to provide water to her home. Jiménez–Benceví found a hose of sufficient length that would stretch from the water heater in Pazmino's house to an exterior faucet at her neighbor's house. Using pliers and scissors to make sure the hose fit, Jiménez–Benceví connected the hose from the neighbor's home to Pazmino's water heater. Pazmino noted that the Jiménez–Benceví measurements were so precise that the mechanism escaped the notice of her neighbors in the gated community. When Jiménez–Benceví was finished, Pazmino had running water in every room of her house, which consisted of three bedrooms and two bathrooms. Pazmino recalled that both her and her friend, Joselin, were very impressed by Jiménez–Benceví's ingenuity, saying he was really intelligent.

Second, we also learned—through the testimony of the lay witnesses—that many of the characterizations Dr. Weinstein articulated in his written declaration and his testimony were factually inaccurate or misleading. Consider the "partial interview" that Dr. Weinstein conducted with Pazmino. Dr. Weinstein discusses his interview with Pazmino on pages nine and ten of his "Declaration." (Docket No. 250–3 at 9–10.) The impression one has from reading Dr. Weinstein's report is that Pazmino acted as a caretaker to Jiménez–Benceví, helping him to complete his daily routine. However, Pazmino specifically rejected Dr. Weinstein's assertions that she had to provide substantial help to Jiménez–Benceví with his daily tasks, such as his banking or ordering food. Pazmino described Jimé-

nez–Benceví as someone who was bright, self-motivated, and enterprising, of firm convictions, and who successfully manipulated the people around him to get what he wanted. She described the level of control and assertiveness that Jiménez–Benceví showed as impressive, noting that he would regularly call Puerto Rico giving orders to send money to his account. Contrary to Dr. Weinstein's descriptions, she recalled that Jiménez–Benceví boasted of having many friends. She specifically recalled that Jiménez–Benceví once showed her a YouTube video of him and his friends riding four wheelers. His "compa," or group of friends, would call him by his nickname, "El Save."

Dr. Weinstein's pattern of minimizing Jiménez–Benceví's strengths while concealing or distorting important context runs throughout the entire report. His interpretation of Jiménez–Benceví's car purchase from "Witness X" is similarly unpersuasive. (Docket No. 250–3 at 8.) Dr. Weinstein describes a transaction in which Jiménez–Benceví paid Witness X monthly payments for a car that was titled in Witness X's name. Dr. Weinstein interprets the transaction as one in which Jiménez–Benceví was exploited. (Docket No. 305 at 11.) Dr. Weinstein seems to never have considered that this transaction was one more example of the way in which Jiménez–Benceví improvised and developed a clever solution to overcome apparent obstacles. Unable to buy a car in his own name because of poor credit, Jiménez–Benceví found a way to acquire a car by way of informal purchase. (Docket No. 305 at 12.) Jiménez–Benceví's use of a false identification in two jurisdictions, his steady income from illicit activities, his ability to evade capture by the police—all of these suggest a person who had no problems with self-care, money management, gullibility, or many other adaptive behaviors. There is no suggestion that

Dr. Weinstein even considered an alternative interpretation other than his own.

These same flaws are apparent in Dr. Weinstein's treatment of Jiménez–Benceví's employment under Ríos–Polo. (Docket No. 305.) As Jiménez–Benceví's employer for three months at his mechanic shop in 2011–2012, Ríos–Polo had many opportunities to observe Jiménez–Benceví. Ríos–Polo provided numerous reasons for his belief that Jiménez–Benceví was not mentally retarded. (*Id.* at 50–60.) Ríos–Polo noted that Jiménez–Benceví was punctual, well-groomed, and "very intelligent." (*Id.* at 57–60.) Ríos–Polo also noted that Jiménez–Benceví was able to perform a wide variety of tasks in the mechanic shop, including fixing brake pads, tiling the bathroom, and mixing and applying two-tone paint with sophisticated machinery. (*Id.* at 81.) Ríos–Polo was particularly impressed with Jiménez–Benceví's painting abilities. (*Id.*) Because of the precise color and weight measurements required, correctly using the shop's paint gun required a lot of skill and intelligence. (*Id.*) Somehow, Jiménez–Benceví always did a good job with this, despite never having been taught by Ríos–Polo. (*Id.*) Ríos–Polo even treated Jiménez–Benceví as something of an assistant-manager, trusting Jiménez–Benceví to give instructions to the other employees. (*Id.*) Again, rather than confront the account given by Ríos–Polo, Dr. Weinstein barely mentions him. (Docket No. 305 at 21.) When pressed during cross-examination, Dr. Weinstein simply minimized the significance of Ríos–Polo's testimony, arguing, without more, that Jiménez–Benceví's employment under Ríos–Polo was a form of gross exploitation. (*Id.*)

Finally, Dr. Weinstein also makes many of the same errors of judgment as Dr. Margarida. Two of the adaptive behavior standardized tests that he used evaluated

Jiménez–Benceví as he existed at age ten and age sixteen. (Docket No. 250–6 at 1.) While these may be relevant to prong three, they are entitled to little weight under prong two, which requires a present-day focus on a defendant's adaptive behaviors.

### 3. Dr. Herrera's Report

Dr. Herrera prepared a report of his evaluation of Jiménez–Benceví. (Docket No. 248–4.) Dr. Herrera also provided a supplemental declaration clarifying an error in his report. (Docket No. 248–5.) On February 18, Dr. Herrera testified in court.

Dr. Herrera performed a clinical interview of Jiménez–Benceví on January 14, 2013. (Docket No. 248–4 at 1.) One of the first things that Dr. Herrera noted was Jiménez–Benceví's attempt to misrepresent important facts about himself. (Docket No. 248–4 at 3.) For example, Jiménez–Benceví indicated to Dr. Herrera that he was largely anti-social and had few friends. This was contradicted by Pazmino's account that Jiménez–Benceví has many friends, whom he kept in contact with on a daily basis through social media and text messaging. (*Id.*) Perhaps more importantly, Jiménez–Benceví misrepresented the level of sophistication of his job duties while employed by Ríos–Polo as an auto mechanic. Jiménez–Benceví told Dr. Herrera that he largely did cleaning at the mechanic shop. (*Id.* at 4.) But Ríos–Polo's testimony indicated that Jiménez–Benceví handled many kinds of sophisticated tasks with ease.

Dr. Herrera also conducted in-depth interviews with Mutt–Ortiz, Ríos–Polo, and Nasha Pazmino. (Docket No. 248–4 at 11–13.) First, the lay witnesses that Dr. Herrera spoke with did not have the same motivation to provide helpful answers to Jiménez–Benceví as many of the witnesses chosen by Dr. Margarida. We were also impressed by the objectivity and consistency between Dr. Herrera's accounts of his interviews and the testimony these witnesses provided in court—unlike Dr. Weinstein's report.

Dr. Herrera wrote that each of the three witnesses, when asked whether they considered Jiménez–Benceví mentally retarded, answered emphatically and firmly "No." Each had several concrete examples of Jiménez–Benceví's intelligence. Ms. Mutt–Ortiz opined that Jiménez–Benceví "in no way had a diminished capacity," and at most had a learning disability. (Docket No. 248–4 at 12.) She remembered Jiménez–Benceví as a leader among his peers, rather than a follower. (*Id.*) (Docket No. 347 at 94–102.) Mutt–Ortiz recalled that when Jiménez–Benceví would arrive to school, a group of children would go to meet with him in the field outside of the classroom to congregate. (*Id.*) Jiménez–Benceví never had any problems doing his mathematics or written assignments, which he could do "whenever he wanted to." Mutt–Ortiz recalled that Jiménez–Benceví's only problems were his defiant attitude, poor attendance, and general unwillingness to follow rules or obey authority. (Docket No. 347 at 94–102.) Dr. Herrera appropriately took this analysis into account in his report.

Dr. Herrera also found that Jiménez–Benceví's work history provided further evidence of Jiménez–Benceví's successful adaptive behaviors. Ríos–Polo saw Jiménez–Benceví as an "intelligent and capable person." (Docket No. 248–4 at 14.) Ríos–Polo explained that Jiménez–Benceví was a self-starter and that he never had to be instructed more than once. Even if Jiménez–Benceví had not previously performed a task, Ríos–Polo felt confident asking Jiménez–Benceví to do it. Ríos–Polo noted that Jiménez–Benceví was very re-

sourceful and had above-average problem-solving skills. During Ríos–Polo's testimony, we listened to countless examples of Jiménez–Benceví's vocational abilities. (Docket No. 305 at 50–60, 80–82.) We were impressed by the wide range of activities that Jiménez–Benceví mastered with minimal instruction.

Ríos–Polo also noted that Jiménez–Benceví's hygiene and presentation were always very neat and well-groomed. (Docket No. 248–4 at 14.) Ríos–Polo also noted that Jiménez–Benceví was a guarded person, but he always acted in a respectful and appropriate manner. (Li) From Ríos–Polo's observations, Dr. Herrera discerned several of Jiménez–Benceví's strengths, including his communication, self-care, social and interpersonal skills, use of community resources, self-direction, work habits, health, and safety. *See Atkins*, 536 U.S. at 318, 122 S.Ct. 2242 (citing DSM–IV 41). Dr. Herrera summarized Ríos–Polo's description of Jiménez–Benceví as "totally contrary to what could be expected" of a person with mental retardation. (Docket No. 248–4 at 15.)

Based on the data he collected from the lay witnesses, as well as the testing data set forth in his report and in-court testimony, Dr. Herrera opined that Jiménez–Benceví did not suffer from adaptive behavior limitations under prong two of the *Atkins* analysis. We agree with his conclusion that Jiménez–Benceví does not meet prong two of the mental retardation definition provided in *Atkins*.

### 4. *Dr. Grodzinski's Report*

Dr. Grodzinski submitted a report of his evaluation of Jiménez–Benceví. (Docket No. 248–1.) He also provided two supplemental reports that analyze the work of Dr. Margarida and a sworn statement provided by Jiménez–Benceví. (Docket Nos. 248–2, 248–3.) On February 18, Dr. Grod-

zinski testified in court. As we did in the *Candelario–Santana* case, we found Dr. Grodzinski to be a credible and professional clinician.

Dr. Grodzinski met with Jiménez–Benceví and performed a clinical interview. (Docket No. 248–1.) During this interview, Dr. Grodzinski administered seventeen psychological tests. Dr. Grodzinski also reviewed the available records and interviewed several witnesses who knew Jiménez–Benceví. (*Id.* at 9–11.) These witnesses included Dr. Rullán; Ms. Mutt Ortiz; Witness X, the person who sold the car to Jiménez–Benceví; two law enforcement officials who had worked on cases involving Jiménez–Benceví; another percipient witness who was Jiménez–Benceví's rival in the drug business; and two of Jiménez–Benceví's former employers, including Ríos–Polo. (*Id.*) Based on all of this information, Dr. Grodzinski concluded that Jiménez–Benceví did not suffer from significant adaptive behavior limitations. (*Id.* at 12.) We agree with this conclusion.

Dr. Grodzinski opined that many of Jiménez–Benceví's behaviors—including his poor academic performance—could be explained by Jiménez–Benceví's extremely traumatic upbringing and history of "psychosocial deprivation." (*Id.*) In particular, Dr. Grodzinski noted that Jiménez–Benceví had been physically and emotionally abused as a child. (*Id.*) According to Dr. Grodzinski, this type of environment, combined with a record of educational failure, could easily produce a number of behavioral disorders, including the defiant and oppositional attitude manifested by Jiménez–Benceví. (*Id.*)

Dr. Grodzinski's report emphasizes that Jiménez–Benceví consistently exhibited highly adaptive behaviors to the people around him. Dr. Grodzinski notes that Mutt–Ortiz recalled that Jiménez–Benceví had a learning delay due to his poor at-

tendance and behavior problems, but never any intellectual impairment. Neither she nor anyone at Jiménez–Benceví's school ever diagnosed Jiménez–Benceví as mentally retarded. Dr. Grodzinski notes Jiménez–Benceví's work history was even more suggestive of adaptive behavior strengths. Dr. Grodzinski indicates that Ríos–Polo recalled that Jiménez–Benceví had no problems remembering things, was quick to learn new skills, and was cautious and intelligent in dismantling and assembling heavy machinery and complex mechanical parts. Ríos–Polo also recalled that Jiménez–Benceví had good conversation skills and was able to change his physical appearance depending upon the situation. Dr. Grodzinski makes mention of another individual who had contracted with Jiménez–Benceví for handyman services who believed that Jiménez–Benceví had a sophisticated bearing. This individual also noted that Jiménez–Benceví was capable of replacing flooring, plumbing, plastering, welding, and assembling a window. After Jiménez–Benceví was arrested, this individual realized that Jiménez–Benceví had given him false identification.

### 5. Conclusion

On the basis of all the evidence presented, and using their expert clinical judgment, the government's experts concluded that prong two was not a close call. We agree with that judgment. As the APA states, "[m]ental [r]etardation would not be diagnosed in an individual with an IQ lower than 70 if there are no significant deficits or impairments in adaptive functioning." DSM–IV at 42. We have seen no credible evidence of any significant limitations in Jiménez–Benceví's adaptive behavior that would suggest mental retardation. Jiménez–Benceví has simply failed to carry his burden of demonstrating, by a preponderance of the evidence, that he suffers from significant limitations under this prong. Therefore, the failure to satisfy prong two alone would be sufficient to find Jiménez–Benceví not mentally retarded.

### C. Prong Three: Onset Before the Age of 18

In light of our above findings that Jiménez–Benceví is not mentally retarded presently, any deeper analysis under this prong is unnecessary. We note briefly that for the purposes of prong three, there is very little credible evidence that Jiménez–Benceví showed signs of being mentally retarded before the age of eighteen. The only two non-family members who evaluated Jiménez–Benceví before he was eighteen—Mutt-Ortiz and Dr. Rullán—both concluded that Jiménez–Benceví was not mentally retarded at that time. This characterization stood unquestioned for twelve years, until the commencement of these proceedings. We think that the prior view of Dr. Rullán, and the current opinion of Mutt–Ortiz, is the correct one. We reiterate our belief that Jiménez–Benceví's poor academic skills are more easily explained by his poor behavior, disturbed home environment, and spotty attendance at school than by mental retardation. In conclusion, we see no signs that Jiménez–Benceví was mentally retarded before the age of eighteen.

### IV.

### CONCLUSION

Following the three prong analysis—and informed by the reports and testimony given by the experts and lay witnesses—we are convinced that Jiménez–Benceví does not meet the definition of mental retardation under *Atkins*. This case will proceed as a death-penalty eligible prosecution.

Jiménez–Benceví's motion, (Docket No. 141), is hereby **DENIED.**

**IT IS SO ORDERED.**